**HOUSTON BELT & TERMINAL RY. CO. et al. v. DAVIS.   (No. 9277.)**

Court of Civil Appeals of Texas.   Galveston.
June 6, 1929.

Rehearing Denied July 11, 1929.

78

Franklin & Blankenbecker and Andrews, Streetman, Logue & Mobley, all of Houston, and Terry, Cavin & Mills, of Galveston, for appellants.

Sam C. Polk and King, Wood & Morrow, all of Houston, for appellee.

GRAVES, J. This general statement, mainly from appellants' brief, is conceded to be substantially correct:

"Plaintiff alleged the operation by the defendants of a line of railroad extending into and through various portions of the City of Houston and intersecting, among others, McKinney Avenue, which was alleged to be a much used thoroughfare; that while plaintiff was operating his automobile along and upon McKinney Avenue, within the corporate limits of the City, he was struck by a train or engine of the defendant, Gulf, Colorado & Santa Fé Railway Company, numerous grounds of negligence on the part of the company being alleged as the proximate cause of the collision, among them being that the train was operated at a speed greater than 18 miles per hour in violation of a city ordinance; that the train was operated at a high and dangerous rate of speed under the circumstances; failure to sound the whistle or ring the bell as the train approached the intersection; obstructing plaintiff's view of the crossing by placing coaches or cars in close proximity to the north line of McKinney Avenue; that the flagman regularly stationed at the crossing in recognition of its being a dangerous one to give warning of approaching trains, did not keep a proper look-out for such trains, did not warn plaintiff of the approaching train, and was not at his post of duty as plaintiff and the train approached the intersection; that as the result of each and all of the various alleged negligent acts of defendants, plaintiff's car was struck by the train at the point in question, seriously and permanently injuring plaintiff, causing him great pain and suffering, loss of time, diminished earning capacity, doctors' and nurses' bills, etc., to his total damage in the sum of $27,950.00, for all of which he prayed recovery.

"To plaintiff's pleading defendants answer-

ed by general demurrer, general denial, and a special plea of contributory negligence, such contributory negligence being plead in detail and consisting principally of allegations that plaintiff did not listen or look for the approach of the train, nor reduce the speed of his automobile before going upon the crossing in question; failing to exercise ordinary care to discover whether a train was approaching, and in driving upon such crossing in disregard of the flagman stationed thereat at the time and warning plaintiff and others of the approach of the train; in disregarding the whistle and bell of the train, then and there being blown and rung to give warning of its approach; without taking any precaution to discover whether he could safely proceed across the track, each and all of these alleged acts of contributory negligence being plead in bar of any right of recovery on plaintiff's part.

"The case was tried to a jury, to which it was submitted on special issues, those relating to the reciprocally alleged charges of negligence, together with the jury's answers thereto, were as follows:

" '1. Was the train in question operating in the City of Houston, as it approached and crossed over McKinney Avenue, on the occasion in question, in excess of 18 miles per hour? Yes.

" '2. Was such operation of the locomotive engine a proximate cause, as that term has been herein defined, of plaintiff's injuries, if any? Yes.

" '3. Did the locomotive and train in question approach and attempt to cross McKinney Avenue, on the occasion in question, at a dangerous and excessive rate of speed in the light of attending circumstances? Yes.

" '4. Were the operators of said locomotive and train guilty of "negligence" as that term has been herein defined, in so running and operating the same at such rate of speed? Yes.

" '5. Was such negligence a proximate cause, as that term is herein defined, of plaintiff's injuries, if any? Yes.

" '6 Did the flagman, on the occasion in question fail to warn plaintiff of the approach of the train at such time and place as would have enabled the plaintiff, in the exercise of ordinary care, to have stopped his car and avoided the collision? Yes.

" '7. If you have answered Special Issue No. 6 "Yes" and in that event only, then you will answer the following special issue: Was the failure of the flagman so to do "negligence" as that term is herein defined? Yes.

" '8. If you have answered the foregoing special issue in the affirmative, and only in that event, then you will answer: Was such negligence on the part of the flagman a proximate cause, as that term is herein defined of plaintiff's injuries, if any? Yes.

" '9. If you have answered special issues Numbers 6, 7 and 8 "Yes," and in that event only, then you will answer: Did such negligence on the part of the flagman lead the plaintiff to believe that the crossing was clear and safe for him to pass over? Yes.

" '10. Did the plaintiff, as he approached and attempted to cross the track, on the occasion in question, exercise such care with reference to the rate of speed at which he was traveling at the time, as an ordinarily prudent person would have exercised under the same or similar circumstances? Yes.

" '12. Did the plaintiff, as he approached and attempted to cross the crossing exercise such care, with reference to looking for trains, as a person of ordinary prudence would have exercised under the same or similar circumstances? Yes.

" '13a. Did the plaintiff, as he approached and attempted to cross the crossing, exercise such care with reference to listening for trains, as a person of ordinary prudence would have exercised under the same or similar circumstances? Yes.

" '14. Did the plaintiff, on the occasion in question, know of the approaching train in time, in the exercise of ordinary care, to have stopped his car and avoided the collision? No.'

"While those relating to plaintiff's claimed damages, and the jury's answers, were these:

" '19. What sum of money, if paid now in cash, would be fair and adequate compensation for the injuries alleged and proven, if any, to have been received by plaintiff, D. S. Davis, on the occasion in question, taking into consideration exclusively the following elements of damages, and none other:

" '(a) Mental anguish and physical pain and suffering, if any, suffered by him as a direct result of such injuries, if any, received by him down to the date of the trial.

" '(b) Physical pain, discomfort and suffering, if any, which you may believe he will reasonably suffer in the future, and beyond the trial, as a direct result of such injuries, if any, received by him on the occasion in question.

" '(c) Such sum or sums of money as he may have lost as a result of lost time from his work, if any, as a direct result of the injuries by him received on the occasion in question, if any, from the date thereof down to the date when you find, and believe he was able to resume work.

" '(d) The present cash value of such sum or sums of money as he may lose in the future and beyond the date of the trial, if any, because of his diminished capacity to pursue his work or profession, if any, as a direct result of the injuries received by him on the occasion in question, if any.

" '(e) Such sums of money as plaintiff has necessarily incurred for hospital bills, X-ray pictures, and the services and attention of physicians, as you may find and believe was

necessary and was usually and customarily charged for similar services, not exceeding the amount shown by the evidence, if any, to have been so incurred, and in no event to exceed the sum of $500.00, the amount sued for on this item.

" '(f) The difference in the actual cash market value of plaintiff's automobile as it existed immediately prior to the collision, if any, and its actual cash market value, as it existed immediately following the collision, if any.

" 'You will, for your answer to this issue, state in the aggregate the amount you find, it any, in dollars and cents. $14,343.00.'

"From the amount of the verdict thus found by the jury was deducted $425.00, agreed upon by the parties as representing the value of the automobile, thus leaving the recovery to plaintiff of $13,918.00."

Protesting against the judgment through this appeal, the railway companies in their brief say:

"In other words, the prime contention of appellants in this case is that approximately 90% of the amount awarded plaintiff by the jury which tried this case was awarded him upon an element or item of damage in support of which the record is absolutely devoid of testimony, to-wit, that of diminished future earning capacity. We are frank to say that it is upon this proposition more than any other, that we hang our hope for a reversal of the judgment in this case. And it is no mean hope. For it is so clear as not to need discussion that there is in this record not even the renowned scintilla of evidence showing, or having any tendency to show, that plaintiff's earning capacity has been diminished to any extent, or in any degree whatsoever. And it is equally well shown by the record that $12,500.00 of the total judgment of slightly over $14,000.00, awarded in this case, was so awarded to compensate plaintiff for what the jury imagined to be his diminished capacity to labor and earn money in the future."

We prefer to dispose of the other contentions in advance of this one.

■ This definition of proximate cause is criticized on the ground that it omits entirely the essential information of "new independent" cause:

"Proximate cause, as that term is used in these instructions, means that cause which immediately precedes and directly produces the injuries, and without which the injuries would not have happened, and the happening of which might reasonably have been anticipated as a natural and probable consequence."

The only "new independent" cause claimed to have intervened here was the alleged contributory negligence of the appellee, but that had been specifically pleaded by appellants, and, pursuant to such isolation of it from the issue as to primary negligence upon their part, the court had otherwise separately and correctly both defined and submitted concerning it special issues 10–15, inclusive, most of which have been quoted, so all danger of the jury's disregarding that was removed; furthermore, the terms of this attacked definition had the same effect, since its requirement that the act complained of as negligent must have "immediately preceded" and "directly produced" the injuries made clear the idea that they must find it to have been the responsible cause thereof. Bergman Produce Co. v. American Ry. Express Co. (Tex. Civ. App.) 262 S. W. 892; Gulf, C. & S. F. Railway Co. v. Saunders (Tex. Civ. App.) 286 S. W. 921; Wichita Valley Ry. Co. v. Williams (Tex. Civ. App.) 3 S.W.(2d) 143; Boyles v. McClure (Tex. Com. App.) 243 S. W. 1081; Chicago, R. I. & P. Ry. Co. v. Reames, 63 Tex. Civ. App. 29, 132 S. W. 978.

Complaint is also made of the overruling of special exceptions to quoted special issue No. 19, and subdivisions (b) and (d) thereof, to the purport that: (1) The expressions, "if now paid in cash" and "present cash value" were neither defined nor explained; (2) subdivision (b) permitted the jury to speculate as to the extent or duration of any possible future pain or suffering, there being no competent evidence even tending to show that the appellee would in the future have to endure any such discomfort at all; (3) there was not sufficient evidence to even raise the issue that appellee's earning capacity in the future had been diminished.

Error in the court's charge is asserted in these respects: (1) In refusing to place the burden of proof upon the appellee to exonerate himself from the charge of contributory negligence, his own testimony having at least raised that issue; (2) in directing the jury to consider all the testimony submitted by either side in determining the preponderance of the evidence as a whole upon any issue; (3) in verbally telling the jury, prior to the reading of any pleadings or the receipt of any evidence, not to consider the question of attorney's fees, nor to visit the scene of the accident during the trial, nor to arrive at their verdict by the chance, lot, or quotient methods.

Refusal of the court to grant appellants' motion for instruction to the jury to disregard argument of appellee's counsel commenting on the failure of the conductor in charge of this train to testify at the trial, as well as to admit in evidence photographs taken next morning after the collision showing conditions on the railroad tracks north of McKinney Avenue, is next presented.

There follow contentions that the jury's answers to special issues 1 to 9, inclusive, 12, and 13a, are so contrary to the weight of the evidence as to be clearly wrong.

Neither, we think, were any of these proceedings shown to be prejudicial.

■ Instructing the jury as to the meaning of the terms "if now paid in cash" and "pres-

ent cash value," in the plain circumstances used, would have been explaining the obvious; the elements of damage given were the proper ones, and it would be going far afield to assume that a jury of ordinary intelligence did not understand how, under the very common method these expressions involved, to reduce them to the equivalent of cash in hand to the injured man at that time. Southern Traction Co. v. Owens (Tex. Civ. App.) 198 S. W. 155; St. Louis, S. F. & T. Railway Co. v. Taylor (Tex. Civ. App.) 134 S. W. 821; Texas & P. Railway Co. v. Johnson (Tex. Civ. App.) 106 S. W. 776; City of Nacogdoches v. Wise (Tex. Civ. App.) 300 S. W. 951; Chicago, R. I. & G. Ry. Co. v. Hammond (Tex. Civ. App.) 286 S. W. 485.

The sufficiency of the evidence to justify the submission of issue No. 19, in the form given, will be heeled herein for discussion.

■ There is no contention that appellee was shown to be guilty of contributory negligence as a matter of law, merely that his own testimony raised that issue; so the question was one of fact, and, appellants having specifically pleaded acts of such alleged negligence on his part, the burden was still upon them, as the court charged, to establish that defense by a preponderance of the evidence, even were it conceded that his testimony was sufficient to require a submission of the question to the jury. Houston & T. C. Ry. Co. v. Harris, 103 Tex. 422, 128 S. W. 897; Louisiana Ry. & Nav. Co. v. Cotton (Tex. Civ. App.) 1 S.W.(2d) 398; Houston & T. Railway v. Anglin, 99 Tex. 349, 89 S. W. 966, 2 L. R. A. (N. S.) 386; Ft. Worth Gas Co. v. Cooper (Tex. Civ. App.) 241 S. W. 282.

■ The objection to the court's directing the jury to consider all the evidence, whatever its source, rests, to quote from appellants' brief, upon this view:

"Indeed, we think it would be imposing quite an impossible burden upon any jury to require it to consider and give credence to all the testimony heard in an average law suit, particularly one in which the testimony was as contradictory on many points as it was in this one."

But the charge laid no such burden upon the jury; it neither required them to give credence to, nor deprived them of the right to reject, any testimony heard—merely enjoined upon them that they should consider it all in the exercise of their exclusive province of determining the effect of it.

■ Untenable likewise are the complaints made against the court's advance oral admonition to the jury not to do the several things mentioned as having been held by the higher courts to be improper in arriving at verdicts; none of these related to issues litigated in this cause; and, being so detached, all were so obviously salutary in effect that it is plain no possible harm could have come from them. Luse v. Beard (Tex. Civ. App.)

252 S. W. 246; Southern Tract. Co. v. Wilson (Tex. Com. App.) 254 S. W. 1106.

■ The challenged argument of appellee's counsel was in the form of an inquiry as to why the conductor in charge of appellants' train had not been called to deny the statement of one of appellee's witnesses to the effect that he and the conductor met, at the time of the accident, where appellee's car was entangled in the front end of the engine, that the conductor was noting in his book the names of witnesses to the accident when he insisted, using the emphatic language attributed to him in the bill of exceptions, that he should be helping to get the appellee out of the wreck.

Another witness testified to the same facts, except as to this conversation. The conductor was not summoned.

Under our holdings, this comment does not appear to have been improper in the circumstances; in any event, it related to something entirely aside from any question before the jury, having to do only with the personal attitude of the conductor, hence was harmless. Missouri Pac. Ry. Co. v. White, 80 Tex. 207, 15 S. W. 808; H. E. & W. Texas Ry. Co. v. Boone, 105 Tex. 190, 146 S. W. 533; Sovereign Camp, W. O. W., v. Martin (Tex. Civ. App.) 211 S. W. 270.

■ No bill of exceptions to the action of the court in excluding the photographs referred to appears in the record, so nothing on that score is presented for review here.

We have carefully reviewed the statement of facts, with the result that we are unable to find the jury's answers to any of the issues upon negligence or contributory negligence against the weight of the evidence, as contended; on the contrary, there appears sufficient support for each and all of them.

Lastly, the previously quoted "prime contention" is urged, through a number of propositions, the boiled-down gist of which is this earnest insistence that the hearing upon motion for new trial indisputably disclosed that $12,500 was awarded appellee for diminished earning capacity in the future, or for permanent partial disability, or for both, without any evidence whatever to support either.

■■ Despite the respect in which it holds the opinion of appellants' able and high-class counsel, this court is unable to agree that it so appeared; in other words, we fail to find either that $12,500 was allowed solely on account of one or both of these two elements or that either was without supporting evidence, concluding, rather, that the jury were reasonably shown to have considered, in addition, both past and properly anticipated future pain and suffering, and that there was no such lack of sufficient support in the testimony concerning any of the three elements thus taken into account as rendered the composite verdict improper or excessive.

Appellants' contrary view rests upon what

seem to us to be two assumptions not justified from a consideration of the testimony in its entirety, first, that there was no evidence whatever of any reasonably probable future disability, because Dr. Stokes said he thought there was a loss of only about 20 per cent. of the dorsal flexion—not in the use—of appellee's ankle, which might possibly improve some, and, second, that the jury, misconstruing that to mean an enduring general physical disability of 20 per cent., concluded upon it as a sole basis that there would also be a like per cent. of permanent diminution in his earning capacity.

It is true Dr. Stokes so limited this one expression, and the jury may have to some extent misinterpreted what he did say in that particular, but it by no means follows that a finding of material and abiding disability was not a reasonably probable inference from what was in proof anyway; this was merely the expression of Dr. Stokes' professional opinion on that phase only, in which he stood alone—no one else stating a like one—and to which the jury were not confined, although he had been called as a witness by the appellee; the doctor further testified that, among many injuries and lacerations, there was a fracture in the ankle joint itself known as a fracture of the styloid process of the thibula, which produced a large ulcer that necessitated in immediate treatment the grafting of 60 or 70 pieces of skin, causing inflammation, along with impaired circulation, and then added:

"That is an impairment of the dorsal flexion or evidence of impairment in the foot, of approximately ten degrees of the arc of motion. That had remained up until that time at least and having been present about ten months I was inclined to believe it would not improve much more.

"The last time I saw him it is my judgment as a result of this injury there was a limited or restricted motion of that ankle running from 20 to 25 per cent. * * * I doubt whether he will have the complete normal recovery of that joint, but you cannot say he will not have some improvement. I feel sure he will have some percentage of limitation of motion in that ankle.

"That condition he has will be calculated to make him walk with a limp. If this condition is permanent he will always walk with a limp. That was such an injury as would cause pain and suffering. An injury in the medical profession is always considered to be worse when it involves a joint than an injury some other place where no joint is involved, especially when the joint is open because of the danger of induction of infection.

"I could only estimate how long this injury he received caused him pain, because it varies with different individuals. * * * I would expect he would have discomfort in that joint always when he engaged in any-

thing that produces extreme dorsal flexion of the joint * * * the reason being when the joint bones come against the leg bones in the motion of dorsal flexion, or an adhesion formed producing the limitation of the dorsal flexion something would have to give, and if the adhesions give, that is painful because the adhesion in a joint when stretched gives pain.

"That is not the only ill effect that could follow his injury. * * * It is always true in a large ulcer where there is a skin graft, the circulation is not as good as in a normal skingraft * * * and a slight injury would be likely to produce another ulcer there. That is a common observation of all scars and especially on the leg. * * * You can see the impairment of the circulation there now because the area grafted is blue and shows the circulation in that place is not normal; that is the result of the graft on that portion of the body."

The appellee himself was also a witness, making profert of himself and his condition before the jury; after catalogueing the receipt of twenty-six cuts and bruises on his body, the ankle fracture, six weeks' confinement in the hospital, six months more of treatment by physicians, all at a cost for such care of $558, he summed the matter up in this way:

"They took 76 pieces of skin off my right leg and placed them in the hole at the ankle and sealed it with the skin graft, and the majority of them took.

"I went out of the hospital on the 3rd day of June and the 3rd day of July I got off the crutches and started using a cane. * * * I was nervous and run down and lost weight, and the doctor recommended that I go back and stay with my people at San Augustine. At that time I walked with a cane. Before this accident I had no trouble with my leg or ankle.

"The condition of it now and prior to the accident—I cannot use it. I can walk on it but have to take short steps, and it cramps when I step down or up where it is swollen there. The ankle is swollen now. I do not have the same use of it, or motion of the foot as I had before.

"With reference to what is my condition now of the ankle joint as compared with the condition before I received the injury; the bones are loose in there, and it is swollen; the ligaments are strained and it is swollen. I suffer pain with it during cold and wet weather. * * * The condition of the ankle bone on the outside—that is stiff, you cannot move it, and it is hard. It has shown that discoloration since I have been up and moving about. It has been swollen during practically all of that time.

"The pain is not the same all the time, except when they pushed the ankle back it would cause pain in the leg. While I was in San Augustine I also suffered pain and the

wound on the inside broke open and was sore in two places and run for a week. That occurred about the middle of July while I was in San Augustine.

"I still suffer that way. It is better and worse at times. It hurts me the worst when I am out in the weather and get wet, and in the morning when I get out of the bed it is stiff, and I cannot walk until I rub it and get up the circulation. I can walk about a mile on that ankle now without giving out, but if I walk further, it gets sore. * * * I cannot run. There is a difference now in the way I walk and before. I am lame."

█ From this evidence, warrant was not lacking for a finding that the young man had not only suffered a permanent disability of from 20 to 25 per cent. in the use of his ankle, but numerous other effects as well that reasonably would in the future both impair his usefulness and cause him pain and suffering, the extent of which it was the exclusive province of the jury to determine.

It follows, too, as a natural and probable consequence, that diminished earning capacity over what might otherwise have been properly anticipated would also result; it is true no witness affirmatively testified that his earning capacity had been reduced by so many dollars and cents, but that was not an essential, all the facts showing it had been measurably so in the nature of things; common sense and observation, which the triers of fact were entitled to use, would call for no other conclusion; it did undisputedly appear that before his injury the appellee was a young lawyer 28 years old, strong and well, earning $175 per month in his profession, and having a life expectancy of more than 36 years, while after it he was merely shown to be doing a little justice court practice, having a retainer of only $30 per month.

So that the jury could not have allocated the alleged $12,500 to a diminished earning capacity and a 20% disability—or either—that had no foundation in any evidence, but did the new trial hearing demonstrate that they reached their verdict by allowing that sum on account of only those two elements at all?

█ The contrary conclusively appears; only three out of the twelve members were called, every one of whom testified unequivocally that, in arriving at the verdict, the jury did not so limit what was included in this major portion of the award, but took into consideration also the pain and suffering the evidence showed had been and would be endured; in other words, they united in explaining just what they did by saying that, of the $14,343 gross sum returned, they first set apart $1,000 for time lost up to the trial, $500 for medical expenses incurred, and $450 for lessened value of the automobile, reserving the balance of it for the two remaining elements of diminished earning capacity and pain and suffering, the amount of which they estimated by finding: (1) That appellee had sustained a permanent partial disability of at least 20 per cent. and would thereafter be in about the same degree less productive in his work; (2) that his future earning capacity for life should be considered at what his salary had been shown to be before the accident, without allowing for any increase thereof; (3) that his established life expectancy of 37 years should be cut to about 32 years, on the probability that his injuries would shorten his life that much; that applying these processes resulted in a total for impaired earning capacity and suffering of something like $17,000 to $20,000, which they reduced to its present cash value of approximately $12,500, and then added that result to the aggregate of the three items first found, making the total of the verdict rendered.

This verdict so arrived at, in our opinion, neither contravened any principle of law nor prejudiced any right of appellants either as to amounts allowed or methods employed in reaching them; to denominate what this jury were thus shown to have done improper conduct, under our statute, is a misnomer, since the record is wholly devoid of any suggestion of ulterior motive on the part of any member of it; rather does it impress this court as reflecting a most conscientious effort by every juror to do his bounden duty under the law and the evidence.

Further discussion is forborne; the judgment has been affirmed.

Affirmed.

LANE, J. (dissenting). I feel constrained to dissent from the opinion reached by my Associates in affirming the judgment in this case. The evidence relative to the extent of appellee's injury is here shown:

Dr. Stokes, plaintiff's principal medical witness, after testifying to the extent of plaintiff's injuries, his hospitalization, and the treatment therefor, testified with reference to the after effects of plaintiff's injuries as follows:

"When I saw him in February, 1928, the principal motion that was limited was what we call the dorsal flexion, this way, and that was limited, that is at a point where the joint is at right angles with the leg. There is an impairment of the dorsal flexion or evidence of impairment in the foot approximately of 10 degrees in the art (arc) of motion that had remained up until that time at least and having been present about 10 months, I was inclined to believe it would not improve much more. The normal range of the ankle joint I would judge to be about 45 degrees. If you will watch my foot you will see that it passes through an arc of about 45 degrees and you can split that 45 degrees into fractions and think what is 10 degrees. That would be less

than one-fourth or 25%. The last time I saw him it is my judgment as a result of this injury there was a limit or restriction motion of that ankle running from 20 to 25%. It having lasted or been present for a period of 10 months after the accident until the last time I saw him at the time I am testifying about, I doubt whether he will have the complete normal recovery of that joint, but you can not say he will not have some improvement. I feel sure he will have some percentage of limitation of motion in that ankle. The restricted motion existed in February when I last saw him and it was about 20 or 25% at that time.

"I would expect he would have some discomfort in that joint always when he engaged in anything that produces extreme dorsal flexion of the joint, providing the limitation exists, the reason being when the joint bones come against the leg bones in the motion of dorsal flexion or an adhesion formed producing the limitation of the dorsal flexion something would have to give and if the adhesion gave that is painful because the adhesion in a joint when stretched gives pain."

On cross-examination this witness testified in part:

"I do not think it would be entirely comfortable for Dr. Davis to play football, or baseball, or tennis, or something that would involve violent use of that foot; it would cause some discomfort. That it what I mean pain, that is discomfort. I would classify it as being slight pain.

"The only serious injury was in the left ankle. With reference to the percentage of impairment of the dorsal flexion and ability of the patient to move his foot back toward the knee is not particularly harmful, or dangerous in his ability to get about and walk the streets and there is no reason it should interfere with his walking ability; my answer is when one steps forward off the injured foot on the uninjured foot the body goes forward in locomotion and if one has a stiff ankle they either have to take short steps forward or turn the foot out to permit the body to go forward, otherwise his locomotion would be blocked where the leg makes a right angle with the foot; that is an ordinary mechanical proposition. I have observed his walking, he limits his steps a little and turns his foot slightly out. It is a very little of either. With reference to your question if a casual observer would see him walking about the court room or on the street it would not be noticeable; my answer is only when he steps off a curb or climbs a hill, or there is extreme motion of the dorsal flexion. When he goes to a higher or lower level. * * * With reference to your talking about the actual present condition and not the potential that might occur in the future from the injury, and that the only actual physical presence of injury is this diminished ability of dorsal flexion which affects the walking, that is the present condition and the extent of it."

Dr. McDeed, X-ray specialist, testified on direct examination referring to X-ray pictures of plaintiff's foot that "this shows a fullness of the outside of this bone, that means a fluid in the tissue, it shows a dense shadow and with that we determine there was a sprain of the external lateral ligament and he was lying on his back in this picture with his foot up."

On cross-examination he testified:

"I did not find any evidence of any fracture of any of the bones, any distinct fracture, that is a complete break in the congunuity to be broken in two. There is no evidence of a true fracture or any other kind in this picture. * * * That is a ligament back here. That has nothing to do with the bone but is attached to it."

The charge of the court was as follows:

"What sum of money, if paid now in cash, would be a fair and adequate compensation for the injuries received by the plaintiff, D. S. Davis, on the occasion in question, taking into consideration exclusively the following elements of damages and none others:

"(a) Mental anguish and physical pain and suffering, if any, suffered by him as a direct result of such injuries, if any, received by him down to the date of the trial.

"(b) Physical pain, discomfort and suffering, if any, which you may believe he will reasonably suffer in the future and beyond the trial as a direct result of such injuries, if any, received by him on the occasion in question.

"(c) Such sum or sums of money as he may have lost or as a result of lost time from his work, if any, as a direct result of the injuries received by him on the occasion in question, if any, from the date thereof down to the date when you may find and believe he was able to resume work.

"(d) The present cash value of such sum or sums of money as he may lose in the future and beyond the date of the trial, if any, because of his diminished capacity to pursue his work or profession, if any, as a direct result of the injuries received by him on the occasion in question, if any.

"(e) Such sums of money as plaintiff has necessarily incurred for hospital bills, X-ray pictures and the services and attention of physicians as you may find and believe was necessary and was usually and customarily charged for similar services, not exceeding the amount shown by the evidence, if any, to have been so incurred, and in no event to exceed the sum of $500.00, the amount sued for on this item.

"(f) The difference in the actual cash market value of plaintiff's automobile, as it existed immediately prior to the collision, if any, and its actual cash market value as

it existed immediately following the collision, if any.

"You will for your answer to this special issue state in the aggregate the amount you find, if any, in dollars and cents."

The verdict of the jury was for $14,343.

Upon a hearing of defendants' motion for a new trial, three of the jurors who tried the case, including the foreman, testified as follows:

H. C. Colley, the foreman: "With reference to whether I can state fairly accurate what the different items were, the amounts to make up the total of $14,343.00; the first we considered was the actual loss that was sustained through the loss for the time due to the accident, then we took the doctor's bills. I think we allowed $1,000.00 for lost time, then we added to that the doctor bills, it was certified to and the loss sustained on the car. We allowed the difference in value of the automobile before and after. I think we allowed $450.00 for the car. Those three items grouped to that, we added the findings for all of these, A, B, C and D, we considered those together and I think it was $12,500.00 we allowed, taking into consideration he was proven to be 20% disabled for life, and we based that on the amount that was shown he was receiving at the time of the accident. With reference to whether we applied that 20% on any item except D; we did not single out any of these, we figured that would be the loss sustained. With reference to what did we find for D, the diminished earning capacity in the future; as I recall it that was the main issue that would apply to all the others as far as that goes. We were allowing for a loss of 20% earning capacity in the future. With reference to what sum did we find for that part of Sub-division D; I do not know, I could not say, we took all four of them together, or the three of them together. We took the amount he was earning at the time of the accident and we took the American experience table, which shows he had an expectancy of 37 years, and we decided he would not be a whole man beyond 62 I believe it was, taking the whole expectancy it would take him to 65 and we cut off about five or over four years of this expectancy and based it on about 32 years, and we allowed him on the basis of the amount he was earning at the time of the accident and it was 20% of that for 32 years. We took what the evidence shows he was earning at the time of the accident and multiplied it by 32 years, which was some less than the expectancy as shown by the table. We took 20% of that, that made the sum of $12,-500.00."

H. F. Willrich, another juror, testified: "With reference to me telling you as near as I can remember what items were considered by the jury in making up the total amounts; we arrived at these figures, this $14,343.00 included in that it was shown by the doctor that this man was between 20% and 25% permanently disabled and we added the cost of the hospital bills and the cost of the car and also his time, I believe we arrived at the 20% basis, we figured the man was around the age of 30 and when he reached the age of 60 or 62 you might say he would be through and we took 20% of his earnings. I do not recall for how long a period of time. With reference to the number of years we used if that was shown as his life expectancy by the table introduced; I believe you figured about 30 years. I believe it was brought out he was making $150.00 per month and making on the side about $25.-00 per month, that he was making $175.00 per month or about $2100.00 per annum, and we figured say 20% of that amount, we took 20% of that, and what that was we added to the actual expenses of the automobile as shown by the evidence and the hospital and doctor bills and lost time during that time, I do not remember the figures. I could not say to be exact what the large amount was when we took those figures and multiplied it and took 20% of that. I believe it was around $18,000.00 or $20,000.00 and some discussion was brought up if we paid the man that much money he had an opportunity to put it out on interest and it run more than the 20% we wanted to give him."

On cross-examination this juror testified: "We thought and knew if you paid a man too much money he would not get anything and he was 20% to 25% permanently disabled and we gave him the minimum figure on his disability, the doctor stated it was about 20% or 25% and we gave him 20% and tried to figure it on that basis."

On redirect examination: "It was the opinion and verdict of the jury the man's earning capacity in the future had been diminished 20%."

W. J. Kunz, one of the jurors trying this case, testified on motion for new trial: "The amount of the damages as found by the jury was $14,343.00. I remember fairly accurate what items of damage were considered in arriving at that by the jury while fixing their verdict, we figured on the car and the hospital and also the hospital bills. I think we allowed $450.00 for the value of the car, and the hospital and X-ray bills. I do not remember the exact figures on that, we allowed what the bill showed and the time lost during the time he was injured and in the hospital. I do not remember what that was, I think it ran about six months that he was out. That is about all I remember. With reference to whether I remember any calculation that was made as to what the man would probably earn during his life expectancy at the time he got hurt and whether 20% of that was taken; if I remember correctly, I think we figured his earning capacity for about 30 or 32 years and took 20% of that. We used the figure that he was making at the time he was hurt,

$175.00 per month. We took what the evidence showed he was earning at the time he was hurt, about $2100.00 per year, and multiplied that by 32 years, we figured he would continue to earn that, and took 20% of that. I think that amounted to $12,500.00."

On cross-examination: "We took into consideration in arriving at the $14,343.00 the difference in the value of the car immediately before and after the accident, the hospital, the doctor, and X-ray bills and things like that and the time he lost while in the hospital and the time he was off from work. We also took into consideration that he suffered pain, we did take that into consideration. I recall that the doctor testified he was totally disabled from 20% to 25%, we gave him the minimum on that."

On redirect examination: "We figured from the evidence the man's earning capacity in the future was diminished 20%. That was the basis we used in arriving at the $12,500.-00 as I remember it. That was the largest part of the verdict. There is no figures in there for the doctor bills or hospital bills or car or the lost time, the $12,500.00 represented the larger portion of the recovery."

It will be seen that the doctors did not testify that plaintiff had lost 20 per cent. to 25 per cent. of the use of his foot, but only that he had lost from 20 per cent. to 25 per cent. of the dorsal flexion of his ankle. Certainly the testimony of the doctors would not support a conclusion that appellee's earning capacity in the future was diminished 20 per cent.

In the motion for new trial, the defendant complained of the methods adopted by the jury in arriving at its verdict as misconduct which probably worked an injury to it.

I agree with the contention of the appellant. The undisputed evidence of the jurors was to the effect that the jury found from the evidence, first, what damage he suffered as a result of his injury in the payment of doctors' and medical bills, and, second, how much he suffered by reason of damage done to his automobile. The jurors testified that, having determined the damage suffered by appellee by reason of incurment of doctors' and medical bills, and by reason of damage to his automobile, they considered the damage suffered by reason of mental anguish, physical pain and suffering suffered as a result of the injury up to the date of the trial, damages which appellee would reasonably suffer as a result of his injury in the future, the loss which appellee suffered by reason of loss of time up to the date of the trial, and appellee's loss by reason of diminished capacity in the future, all together, and fixed the sum of $12,500; that, since the doctors had testified that the ankle of appellee had been damaged to the extent of 20 per cent., and that such damage would probably be permanent, and as the life expectancy of appellee was shown to be 37 years, they took into consideration the earnings of appellee before his injury, which was shown to be $2,100 per year, and took 20 per cent. of that sum and multiplied it by 32, the number of years they allowed as appellee's expectancy, and that by such method they fixed appellee's loss for the four items last named at $12,500.

The method pursued by the jury in arriving at the loss suffered by appellee by reason of mental anguish, physical pain and suffering in the past and in the future was indeed a novel one. The 20 per cent., the key used by them to solve the problem, had not the remotest relation to the question of damages by reason of mental anguish and physical pain and suffering. It could only be used, if at all, in arriving at the loss of appellee by reason of diminished capacity. The use of such method for determining appellee's compensation for mental anguish, physical pain and suffering is not different from a verdict arrived at by chance or one arrived at by an agreement of the jury that each juror should fix the amount he would assess, and that such amounts would be added together, and the sum divided by 12, and that the quotient should be the verdict of all. Verdicts arrived at in such manner have been many times condemned.

Conceding it to be true that the ankle of appellee, a lawyer, was permanently impaired to the extent of 20 per cent., it is difficult to understand how it could be determined therefrom what he lost on account of diminished capacity in the absence of a showing that his earning capacity was less or would be diminished since he suffered the injury than theretofore, and it is incomprehensible how the loss or damage suffered by reason of mental anguish, physical pain and suffering, etc., could be arrived at by the method used by the jury.

While the writer does not indulge in the belief that the jury acted corruptly in pursuing the method used by them, it was nevertheless improper conduct which probably worked an injury to appellant. I think the judgment should be reversed and the cause remanded for the reason above expressed.