**MISSOURI PACIFIC RAILROAD COMPANY, Appellant,**

v.

**William KIMBRELL, Appellee.**

**No. 7079.**

Court of Civil Appeals of Texas.

Texarkana.

April 14, 1959.

Rehearing Denied Aug. 4, 1959.

Howard S. Hoover, Carroll R. Graham, Hutcheson, Taliaferro & Hutcheson, Woodul, Arterbury & Wren, Houston, for appellant.

W. James Kronzer, John L. Hill, Ragan & Weaver, Hill, Brown, Krinzer & Abraham, Houston, for appellee.

CHADICK, Chief Justice.

This is a suit for damages under the Federal Employers' Liability Act (45 U.S.C.A.

§ 51 et seq.). A judgment for $90,000 is found to be supported by the evidence and the case is affirmed upon remittitur of $30,-000; otherwise, it will be reversed and remanded for new trial.

Wm. Kimbrell, an employee of such railroad, as plaintiff in the trial court, sued Missouri Pacific Railroad Company as defendant to recover damages of $130,000 for injuries alleged to have been inflicted upon him by the negligence of the defendant. The case was submitted to a jury on special issues, all of which were answered favorably to Kimbrell. Judgment based upon the verdict of the jury was entered against the Railroad Company. Exception to the judgment was duly made and the Railroad Company's motion and amended motion for new trial were filed in due course and were overruled. The Railroad Company gave notice of appeal and the case is properly before this Court with the Railroad as appellant and Kimbrell as appellee.

The appellant has briefed six points of error. The first presents for review the action of the trial court in overruling appellant's amended motion for new trial for the reason that the $120,000 verdict by the jury is grossly excessive and shows the award was the result of passion and prejudice. The remaining five points are concerned with the appellant's proposition that there was error in submitting the damage issue because there is no evidence in the record from which a jury could determine the earning power of money in the vicinity of Harris County, Texas, hence, the jury could not discharge its responsibilities to find the present cash value of appellee's diminished capacity to work and earn money or physical pain, suffering and mental anguish proximately caused by appellee's injuries.

Though it produces a lengthy opinion, there is no alternative to stating the facts shown by the record if the opinion is to serve its purpose of informing the parties the reason for the action of the Court and

as a precedent for whatever it may be worth in future cases. The most favorable aspects of the facts are set out in the appellee's brief, and for the purpose of passing upon appellant's Point 1, they are adopted with only slight emendation to remove reference to the record and conclusions appellee's counsel draws from the facts:

"At the time of the accident Appellee was a 33-year old car inspector for Appellant with a life expectancy of 35.15 years. He had a seventh grade education and was raised and worked on a farm until he was eighteen years of age. Until the time he left the farm and up to the time of his employment with Appellant, he engaged in various and sundry public jobs of a manual nature, including truck driving, mechanical work, service station work, running mowing machines, was a part owner in a sand and gravel business which went broke, and was in the United States Air Force as a mechanic for approximately six years. He was married and the father of four young children. He was first employed by Appellant on July 18, 1951, and except for a seniority lay-off in 1954 for approximately seven or eight months, he worked steadily for that company until the time of his accident, receiving the usual advances in position and salary. At the time of the accident he was averaging $370 to $375 per month.

"It was necessary for Appellee to pass a physical examination prior to going to work for Appellant, and other than a mild back strain in 1953 which did not require Appellee to miss any time from work, and an apparent kidney infection in 1954, Appellee had had no difficulty whatsoever in performing the tasks of his employment and was admittedly a good worker and employee.

"At the time of the accidental occurrence Appellee did not think his condition was particularly serious and stated that he felt like he 'just had a little sting in my back'. At another point he stated that it felt like 'hot water or something thrown

on you.' His back was still bothering him when he arrived at his home, and he mentioned it to his wife. That evening, before going to work it was 'hurting quite a bit' and she gave him an alcohol rub. He went to work and as he was moving around it seemed to get some better and 'then it wouldn't'. He mentioned it that night to the relief foreman. * * * he continued working and 'every night it seemed like it kept getting worse and at times it seemed like I couldn't hardly bear it.' On the night of November 26th 'the pain hit me in my back sure enough and just lowered me on my hands and knees it hurt so bad like a baby I cried.' He stated that he 'managed to get up on my feet to where my partner was and he was about three cars ahead of me and I got to him and I hollered "Rosher" and he came around to the end of the car and he wanted to know what was the matter and I said my back has got me down, and he crawled through the car to help me. I went down to my knees again and then he got hold of me and got me back on my feet and supported my back a little and said let's go to the office and we started out.'

"He was taken to St. Joseph's Infirmary where he was given a shot in his arm and he was then returned to his home. The following morning he went to the East End Clinic (where company employees were sent) and Dr. D. L. Moore caused some X-rays to be taken. Dr. Moore told him that he 'had a pretty bad back' and he was given some 'pain pills' and sent home with instructions to return the following Tuesday morning to see Dr. Lane.

"On the following Tuesday morning Dr. Lane examined him and told him that he had 'a muscle tore loose in my left hip' and he was given another shot and some pills. He was advised that if his condition got worse that he should report back to Dr. Lane. He did so on December 4th, 1955 and they sent him to the Appellant's hospital in Palestine, Texas where he remained for six days. He was there placed in traction, and after his discharge he was told to return in about six months. However, because of his condition, he had to return in January of 1956, and he was again confined four or five days at the Palestine Hospital. They again sent him back to Houston, but before leaving he told Dr. Haverlah, the chief surgeon, 'This is not doing no good coming up here, it is just tearing me up, I can't stand to ride that train this long a trip, I have trouble.' Thus, he was instructed to return to Dr. Lane and he did report back to him in April of 1956.

"He was hospitalized on April 3, 1956 in St. Joseph's Infirmary, where a myelogram was performed clearly indicating the rupture of the intervertebral disc at the level of the first sacral segment and the 5th lumbar vertebra. * * *

"Following the positive myelogram, which was confirmatory of a 'classical disc' syndrome, and while still confined to St. Joseph's a laminectomy was performed and the entire disc was removed. At the time of this first operation he was confined at St. Joseph's for a period of nine days and was thereafter confined in bed at his home for 'a couple of weeks'. He was then advised that he 'could get up and stir around a little and then I went to him (Lane) for several months, approximately seven months after the operation', after which Dr. Lane released him 'to go back to work at light duty work.'

"Upon first returning to work following the first operation Appellee was advised that 'they couldn't put me on' and he returned home. On his next visit to Dr. Lane he was given 'another slip' for 'light duty work.' The foreman then gave him light work for four or five days as a 'torch operator's helper' but after that time they sent him 'back into the yard to work on the journal boxes pulling on leads and carrying that weight and I told him I couldn't do it'. His foreman then told him he would put him 'back to work as a torch operator helper' at a lesser rate of pay (approximately $55.00 per month). He con-

tinued to do this type of work but complained that 'my back was getting worse and worse and I kept going to Dr. Lane and finally Dr. Lane said, "Kimbrell, we are going to have to go back into your back and get it straightened out."' Appellee stated that he 'hesitated awhile' about permitting a new operation 'because I knew I went through some awful pains on the first one.' He finally agreed to the second operation, and he was readmitted to St. Joseph's Infirmary where he was re-operated on May 4, 1957. At that time a spinal fusion was performed by obtaining a bone from his right hip and fusing from the 4th lumbar vertebra down to the first sacral segment. * * *

"He was hospitalized for fourteen days in connection with the spinal fusion. In describing the pain that accompanied the second operation, Appellee stated 'it was a awful pain I will tell you, I will tell anyone that, and which I hope no one will ever have to go through with it is an awful pain for anyone.' After he was discharged from the hospital he was told to 'stay in bed at least a month, not to get up or anything only just what I had to do.' From that date until the date of the trial (which commenced December 17, 1957) Appellee continued to see Dr. Lane, stating that 'the last time I saw him I seemed to be improving a little.'

"He stated that at the time of the trial his back still bothered him and his 'left leg still bothers me quite a bit.' * * * he was asked the following question and gave the following answer:

"'Q. I notice you have a good bit of trouble moving around in doing that, are you doing that for the benefit of the jury or are you doing that because that's the best that you can do?

"'A. I am moving around the best I can, Mr. Hill, the best that I possibly can and I'm truthfully saying that, I am not putting on whatsoever, no, sir.'

At the time of the trial he was still wearing a back brace and he stated that his 'left leg has a catch in it every once in a while' which 'comes in there when I sit back long at a time.' He also stated that his back continues to bother him. To the question of whether he had ever been completely free of pain since the last operation he replied 'one time I believe it seemed like it was so good then to be relieved of it I felt like shouting, but then that didn't last long, approximately a day or so.' He stated that except for that time he has had constant pain with his back.

"At the time of the trial he also said he was still having some difficulty with his hip where the bone had been removed for purposes of performing the fusion, but he stated 'it don't bother me nothing like the other part does.' Perhaps his description of his difficulties at the time of the trial can best be shown by the following quotation from the record:

"'Q. Can you tell in the last few months, have you been more or less at a standstill, or are you getting stronger, or how would you describe it? A. It would be, Mr. Hill—seems like that I am doing a little better than I was, it just goes and comes. Sometimes I think I am going to do better, then it hits me again, it just comes and goes. It hurts me more than it leaves me alone. I have more trouble in my back in it hurting with the pains in there than I have ease.

"'Q. How about anything else? I notice you said you feel one side—what I would describe as a slight limp. What accounts for that? A. The nerves and leaders in my leg won't let me put pressure on it like I would like to, Mr. Hill.

"'Q. How far can you bend? I wish you would bend your body as much as you can for the jury. A. I'm afraid I can't do much of that. I can go as far as I can with it, that's as far as I can go with it. (Whereupon the witness demonstrated to the jury).

" 'Q. Does that hurt you when you do that? A. Yes.

" 'Q. Can you bend to the side with your back? A. I can go over this way pretty well.

" 'Q. That's the left side. Now when you make those movements does it aggravate those pains you described in your low back? A. Yes, sir, it does.

" 'Q. Can you bend backwards; does that put a strain on your back in that spot? A. Puts a strain on my back and left leg.

" 'Q. What kind of treatment has Dr. Lane had you under, Mr. Kimbrell? A. I am under this here physical therapy treatment now, Mr. Hill.

" 'Q. Where are you taking these treatments? A. St. Joseph's Hospital.

" 'Q. How long—how regularly are you taking that? A. I take it three weeks straight and he comes—he lets me off three weeks and I am going three times a week now and he said I would take that up until the 2nd day of January, then I was to report back to him.'

"Appellee also said that he was concerned about his condition and 'I would like for it to clear up where I could get back to work.' In the seven months following the second operation Appellee had not been able to do anything. He said that when he 'gets to hurting in my back and in my legs then I got to lay down on the bed.'

"On cross-examination he was asked whether he had 'improved considerably since that (second) operation' to which Appellee replied, 'I wouldn't say considerably, but I can say that I see it has improved a little over the period of time.' He testified that upon 'sitting * * * for a long time I get awful sore' in his legs.

" * * * more than two years following the receipt of his injuries he was still completely unable to do any work of any kind and that the only work that he had done since being pulled out of service on December 4, 1955, less than a month following the accident, was as a 'torch operator helper', and that even this had been painful to him. He had admittedly lost more than $7,000 in actual earnings during that period, and while he had made 'some' improvement over his condition as it existed at the time a second operation was necessary, his condition was still so bad at the time of trial as to prevent any other doctor from performing an adequate physical examination, or even for Dr. Lane to determine whether the 'fusion' was holding. * * *

"(Dr. Lane) examined and treated people for the railroad, forwarding his reports to the chief claim agent and the chief surgeon. He said 'he has a standing commitment to the railroad' to see and treat the employees. * * * the pain was severe enough to Appellee as to make him willing to 'go under the knife.' He stated when he first operated on the plaintiff the disc was 'completely ruptured' and was 'lying free in the canal.' * * * the first operation was unsuccessful, stating that ten to fifteen percent of the laminectomies subsequently require fusion.

" * * * a spinal fusion is 'more operation than he had the first time' and that Appellee had 'adhesions in the area from previous surgery.' Dr. Lane testified these are major and serious operations that are performed only as last resorts following attempts at conservative therapy and that some of these operations are 'spectacularly unsuccessful.' * * * that the injury sustained by Appellee was a 'pain producer,' 'physically makes one suffer,' and is calculated to cause 'mental anguish.' * * * that Appellee had 'severe' pain through some phases of the case.

" * * * Dr. Lane expressed the opinion that he thought he could see union in his fusion at the time of trial, he conceded that you could not be certain that it would hold until the man can exercise all body movements and X-rays can be taken

of the condition at that time. * * * that post-operatively the Appellee 'is more vulnerable to other injury.'

" * * * 'there is no question but what this man has permanent disability. * * * 'I feel that an ordinary spinal fusion with a good result and a solid fusion will have somewhere in the neighborhood of twenty percent general deficiency disability.' His opinion, however, was admittedly subject to several necessary qualifications. * * * the trial was held more than several months following the second operation, it was too early to perform the bending test to determine whether the spinal fusion was successful. The opinion was conditioned on satisfactory physiotherapy, which Appellee had just begun to take shortly before the trial. That 'general deficiency disability' is based purely upon medical function as distinguished from industrial incapacity.

" * * * that his opinion concerning the percentage of medical disability was subject to the qualifications of whether Appellee obtained a successful fusion and good physiotherapeutical results, his opinion concerning his prospective return to his employment was subject to the same qualifications. Regarding these conclusions Dr. Lane conceded that 'as long as you do it on an attempted objective basis' 'one person could arrive at just as intelligent conclusion and just as fair a conclusion about it as the doctor could upon hearing all the facts and all the circumstances surrounding it.' Also, whether a particular man's disability was such as to prevent him from performing the type of work for which he was trained and suited is an "individual case'. He also said the Appellee's condition 'sure would' 'be an impediment to the average man getting a job.' In Dr. Lane's words, 'I'm quite sure not every company would take him, that's correct.'

"This doctor admittedly had not made any extensive research or investigation of the medical authorities concerning the post-operative return of second-operated disc cases. Lane's testimony was that of an adverse witness."

The court in a charge which appears to have been proper, submitted for the jury's answer an issue embracing eight elements of damage which may be summarized as past and future pain and suffering; past and future mental anguish; past and future physical impairment; lost earnings and diminished capacity to work and earn.

■ Keeping in mind the verdict of $120,000, each of the foregoing elements will be considered in relation to the evidence supporting it to determine if the amount of verdict appears excessive. Pain, suffering and mental anguish, past and future, appear to be substantial but is diminishing and it appears reasonably probable that it will not be incapacitating. It is also of some significance that these elements of damage are not aggravated by the appellee's expectancy of immediate or certain grievous injury or death which characterizes many of the cases where substantial damages arising out of such elements have been affirmed by the courts. Past and future physical impairment is substantial but the evidence only supports a partial disability award. The extent of impairment is conditioned upon a successful fusion of the vertebrae and good physiotherapeutical results but the absence of evidence disparaging an expectation of reasonable results limits the jury's consideration to reasonable prospect in this regard. Lost earnings are shown to be in excess of $7,000 and a finding thereon is supported by evidence.

Substantial diminished capacity to work and earn is shown by the evidence. Here, as in the physical impairment element, the difficulty lies in ascertaining the extent. The medical witness was called by the Railroad and his testimony tended to minimize impairment and diminished capacity to work and earn. He estimated approximately 20% general deficiency disability and on cross-examination distinguished this from industrial incapacity and conceded that his estimate was conditioned upon good results and solid fusion and that the percentage of disability was permanent and

agreed that it would be an impediment to getting a job and that not every company would employ a man with such disability. On the other hand, the appellee in stating his disabilities testified:

"My back still bothers me some and my left leg bothers me quite a bit. I still have trouble moving around. I have a surgical scar on my back from the operation and at the present I am still wearing a corset brace. My left leg has a catch in it every once in a while but it is not regular. It comes in there when I sit back a long time, also my back bothers me if I sit a long time."

It is not suggested that considered separately either the medical witness' testimony or that of the appellee is binding upon the jury hearing the case, but under the unusual circumstances of this case where these are the only two witnesses to testify, the jury's findings must be within the bounds of the sum of their testimony. From all testimony the only reasonable conclusion that can be reached is that there is a substantial diminution in appellee's capacity to work and earn which is considerably less than total.

Having considered the myriad factors involved, including employment history, life expectancy, etc., the conclusion is reached that the jury disregarded evidence in reaching a verdict of $120,000, and that such verdict is manifestly too large. It is found that the evidence will support a verdict and judgment of $90,000, and the judgment therefore is excessive by $30,000.

There is no contention between the parties upon the legal issue of the power of the court to review the case on the question of excessiveness of verdict and judgment.[1] The appellant contends, however, that if the judgment is found excessive the case should be reversed and remanded for another trial, and in support of such contention cites Houston Belt & Terminal Railway Co. v. Burmester, Tex. Civ.App., 309 S.W.2d 271, wr.ref., n. r. e.; World Oil Co. v. Hicks, Tex.Com.App., 103 SW.2d 962; Dallas Ry. & Terminal Co. v. Farnsworth, 148 Tex. 584, 227 S.W.2d 1017. The appellee's main contention is that the judgment is not excessive, but if found so, disposition of the case is controlled by Carter v. Texarkana Bus Co., Sup.Ct., 295 S.W.2d 241. The appellee's position is deemed to be correct as to the action of this Court upon a finding of excessiveness. Under Rules 328 and 440, Vernon's Annotated Texas Rules of Civil Procedure, this Court is under duty to reverse the case, unless the appellee remits the excess of damages allowed by the trial court.

With respect to appellant's Points 2, 3, 4, 5 and 6, the same are overruled upon authority of Missouri-Pacific R. Co. v. Prejean, Tex.Civ.App., 307 S.W.2d 284, n.w.h.; Houston Belt & Terminal Ry. Co. v. Davis, Tex.Civ.App., 19 S.W.2d 77, wr. ref.; Bull-Stewart Equipment Co. v. Myers, Tex.Civ.App., 102 S.W.2d 241, wr.dis.

It becomes the duty of this Court, therefore, to order that the case be reversed and remanded for new trial unless within 14 days after date of this opinion the appellee files a remittitur in the sum of $30,000.

On Motion for Rehearing.

On April 16, 1959, appellee filed an unconditional remittitur of $30,000 in compliance with the suggestion of remittitur in the original opinion. This remittitur was filed without prejudice to appellee's privilege of moving for a rehearing.

After again considering the facts, argument and authorities cited, the court has.

[1]. See Deen v. Gulf, C. & S. F. Ry. Co., Tex.Civ.App., 275 S.W.2d 529, wr. ref., n r. e.; 353 U.S. 925, 77 S.Ct. 715, 1 L. Ed. 721; Tex.Civ.App., 306 S.W.2d 171, wr. granted; Tex., 317 S.W.2d 913; Deen v. Hickman, 358 U.S. 57, 79 S.Ct. 1, 3 L.Ed.2d 28; Application for certiorari to U.S.Sup.Ct., filed by Deen, denied 359 U.S. 945, 79 S.Ct. 725, 3 L.Ed.2d 678.

reached the conclusion that the motion for rehearing should be overruled and it is so ordered. The judgment of the trial court will be reduced by the amount of the remittitur and as so modified is affirmed.