Berney L. STRAUSS, Appellant/Cross–Appellee,

v.

**CONTINENTAL AIRLINES, INC., Appellee/Cross–Appellant.**

**No. 14–00–00694–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Jan. 10, 2002.

Rehearing Overruled Feb. 28, 2002.

Don Weitinger, David M. Gunn, Houston, for appellant.

Robert L. Pittsford, Robert Lee Galloway, Houston, for appellee.

Panel consists of Chief Justice BRISTER and Justices FOWLER and SEYMORE.

## OPINION

WANDA McKEE FOWLER, Justice.

Appellant Berney L. Strauss sued appellee Continental Airlines, Inc. for personal injuries suffered as Strauss was boarding a Continental Airlines flight. The case was tried to a jury that found Continental Airlines 75% negligent and Strauss 25% negligent, and awarded damages, including $1,024,000 for loss of earning capacity. The trial court granted Continental Airlines a judgment notwithstanding the verdict on the loss of earning capacity damages, from which Strauss appeals. Continental cross-appeals, arguing that the trial court erred in (1) denying Continental's motions for mistrial and new trial based on Strauss's improper communications with the jurors; (2) excluding records of Strauss's psychiatric treatment; and (3) excluding the testimony of Continental's expert psychiatric witness. For the reasons stated below, we affirm.

## FACTS

Strauss is a personal injury trial lawyer in private practice in New Orleans, Louisiana. In April of 1995, as he was boarding a Continental Airlines flight at the airport in Newark, New Jersey, a Continental employee abruptly shut the airplane door in front of him and Strauss suffered spinal injuries while moving out of the way. He eventually underwent two surgical procedures, a lumbar laminectomy and a three-level fusion of the spine. As a result of his injuries, Strauss suffered from pain and was unable to work full-time.

Strauss sued Continental for breaching the common carrier's duty of care. The trial began on July 27, 1999 and ended August 13, 1999. By the time of trial, Strauss had resumed working full-time. The jurors heard from numerous witnesses, including Strauss, his wife, Continental employees, physicians and other medical personnel, lawyers and non-lawyers from Strauss's law firm, and others, live or by deposition. At the conclusion of the trial, the jury returned a 10–2 verdict that apportioned fault 75% to Continental and 25% to Strauss. The jury awarded Strauss the following: (1) $383,712 for physical pain, mental anguish, physical impairment, disfigurement and medical care in the past; (2) $99,750 for future physical pain, mental anguish, physical impairment, disfigurement and medical care; and (3) $1,024,000 for loss of earning capacity in the past.

After the verdict, Continental filed a prejudgment motion for mistrial, motion for new trial, and motion for judgment notwithstanding the verdict (JNOV). The trial court denied Continental's motions for mistrial and new trial, but granted Continental's motion for JNOV on the grounds that no evidence supported the jury's finding that Strauss had suffered a loss of earning capacity in the past. On May 2, 2000, judgment was entered for $362,596.50 plus prejudgment interest. Continental filed a post-judgment motion for new trial on July 12, 2000, which the trial court denied. Both Strauss and Continental appeal.

### STRAUSS'S APPEAL

We begin with Strauss's sole issue on appeal, his challenge to the trial court's grant of Continental's JNOV on Strauss's claim for lost earning capacity in the past.

As part of his damage claim, Strauss alleged losses in past and future earning capacity. The damage claim focused on legal business Strauss predicted he would have attracted had he been able to drive on a frequent basis to Kosciusko, Mississippi. Strauss testified that Kosciusko was a country town with a sizeable community of maritime workers, so the potential for personal injury maritime claims was good. Because there was no airport in Kosciusko, however, it was necessary to drive several hours by car to engage in marketing activities on a regular basis. Strauss alleged that his ability to obtain referrals in this manner was hampered as a result of his injuries. He did not allege that he was unable to work on cases after they were obtained. As Strauss explained it in his appellate brief, he could "do the grinding but not the finding."

Strauss presented the jury with three alternative damage calculations in support of his lost earning capacity claim. Under the first method, he averaged his annual client fees for the years preceding the accident and then deducted what he would have paid in referral fees to other attorneys in the event that he had relied on them for the referrals. He calculated an average annual drop in fees of $297,000, and, applying that to a period of 4½ years after the injury, he calculated a total damage amount of $1,262,000.

Under Strauss's second method, he totaled his pre-accident fees, after subtracting $1 million for a case he described as an "irregular circumstance," and averaged the annual fee amount for the pre-accident period. He then calculated the average annual fee amount for the period after the accident, and determined that the average annual difference amounted to a drop of $256,000. Over a 4½ year period, this difference would again total over $1 million.

Under the third method, Strauss took his gross fees earned after the accident, averaged them to reach an annual figure,

and then adjusted that average by 40%, the percentage of disability he claimed. The 40% figure was based on the testimony of an orthopedic surgeon who testified that Strauss's injuries corresponded to a physical disability of about a 40% loss of function of the spine. Using this method, Strauss arrived at a total loss of $1,343,000.

The jury subsequently awarded Strauss $1,024,000 for loss of earning capacity in the past, and zero for loss of earning capacity in the future.

Strauss contends that the court erred in granting Continental's JNOV on the damages for loss of earning capacity in the past because it mistakenly equated loss of earning capacity with lost profits, and further erred in incorrectly applying the lost profits analysis to require that Strauss show the loss of specific opportunities. Strauss asserts that the concept of lost profits belongs in commercial cases, where it is merely a type of consequential damages, and not in personal injury cases. Further, Strauss contends that the evidence he presented is more than sufficient to support the jury's finding.

In response, Continental asserts that the issue is in fact one of lost profits, but that under any theory, Strauss has presented no evidence of loss of earning capacity in the past. Continental argues that Strauss's claim for damages is unique because Strauss does not contend that his injury affected his ability to work, only his ability to find work. Consequently, any finding of damages was premised upon multiple layers of unsupported speculation. Continental distinguishes Strauss' claim from the more typical claim of a wage earner, whose salary is readily ascertainable, and contends that Strauss failed to prove with any degree of reasonable certainty that he would have earned the amount of money he was awarded. Conti-

nental complains that Strauss provided no evidence to establish that (1) he lost any cases because of his injuries; (2) any lost cases would have been resolved by the time the case went to trial; (3) Strauss would have been successful in the cases he claims to have lost; (4) Strauss could collect on any judgments for cases he claims to have lost; and (5) Strauss could make a profit on any of the cases he claims to have lost. In connection with the last point, Continental contends that Strauss's damage models do not account for the fees, costs, and expenses associated with litigation. Finally, Continental argues that Strauss's own testimony reflected that his income actually increased after the incident rather than decreased.

### 1. Standard of Review

■■■ A trial court may disregard a jury's findings and grant a motion for JNOV only when there is no evidence upon which the jury could have made its findings. *Best v. Ryan Auto Group, Inc.*, 786 S.W.2d 670, 671 (Tex.1990). To determine whether the trial court erred in granting a motion for JNOV, the appellate court must consider only the evidence and the reasonable inferences that support the jury's answers. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex.1990). The record is reviewed in the light most favorable to the jury's finding, considering only the evidence and inferences that support the finding and rejecting the evidence and inferences contrary to the finding. *See Navarette v. Temple Indep. Sch. Dist.*, 706 S.W.2d 308, 309 (Tex.1986). To uphold a JNOV, we must decide that no evidence supports the jury's findings. *Mancorp*, 802 S.W.2d at 227; *Richardson v. Wal-Mart Stores, Inc.*, 963 S.W.2d 162, 164 (Tex.App.-Texarkana 1998, no pet.). The JNOV should be reversed when there is more than a scintilla of competent evi-

dence to support the jury's finding. *Mancorp*, 802 S.W.2d at 228.

## 2. Analysis

 At the outset, we must distinguish between "past lost earnings" and "loss of earning capacity." Past lost earnings are the actual loss of income due to an inability to perform a specific job a party held from the time of injury to the date of trial.[1] *Border Apparel–East, Inc. v. Guadian*, 868 S.W.2d 894, 897 (Tex.App.-El Paso 1993, no writ). This differs from loss of earning capacity. *See id.; Metropolitan Life Ins. v. Haney*, 987 S.W.2d 236, 244 (Tex.App.-Houston [14th Dist.] 1999, pet. denied).[2]

 Loss or impairment of past, as well as future, earning capacity is recoverable as an element of damages in a personal injury case. *Harris v. Belue*, 974 S.W.2d 386, 395 (Tex.App.-Tyler 1998, pet. denied). The measure of this type of damages is the plaintiff's diminished earning power or earning capacity in the past or in the future directly resulting from the injuries he has sustained. *Southwestern Bell Tel. Co. v. Sims*, 615 S.W.2d 858, 864 (Tex. Civ.App.-Houston [14th Dist.] 1981, no writ); *Greyhound Lines, Inc. v. Craig*, 430 S.W.2d 573, 575 (Tex.Civ.App.-Houston [14th Dist.] 1968, writ ref'd. n.r.e.). Recovery for loss of earning capacity is not based on the actual earnings lost, but rather on the loss of capacity to earn money. *Brazoria County v. Davenport*, 780 S.W.2d 827, 832 (Tex.App.-Houston [1st Dist.] 1989, no writ).

 The plaintiff has the burden of proving his loss of past earning capacity. *McIver v. Gloria*, 140 Tex. 566, 569, 169 S.W.2d 710, 712 (1943); *Southwestern Bell Tel. Co. v. Sims*, 615 S.W.2d at 864. In order to support such a claim, the plaintiff must introduce evidence from which a jury may reasonably measure in monetary terms his earning capacity prior to injury, unless some reason appears for his failure to do so. *Bonney v. San Antonio Transit Co.*, 160 Tex. 11, 17, 325 S.W.2d 117, 121 (1959). Although the amount of damages resulting from impairment of a plaintiff's earning capacity is largely within the discretion of the jury, a jury should not be left to mere conjecture when facts appear to be available upon which the jury could base an intelligent answer. *Id.* The naked or unsupported conclusion of a witness will not support a jury finding. *Texas & N.O.R. Co. v. Wood*, 166 S.W.2d 141, 145 (Tex.Civ.App.-San Antonio 1942, no writ). The injured party is required to introduce sufficient evidence which enables the jury

---

1. The burden of proof for lost earnings in the past is greater than that for loss of earning capacity in the future. *See Home Interiors & Gifts, Inc. v. Veliz*, 695 S.W.2d 35, 42 (Tex. App.-Corpus Christi 1985, writ ref'd n.r.e.); *Bailey v. Merrill*, 582 S.W.2d 489, 490 (Tex. Civ.App.-Beaumont 1979, writ ref'd n.r.e.). This is so because proof of earnings generally requires evidence of the plaintiff's actual earnings prior to and after injury, *City of Rosenberg v. Renken*, 616 S.W.2d 292, 293–94 (Tex.Civ.App.-Houston [14th Dist.] 1981, no writ), while proof of future loss of earning capacity is always uncertain and must be left largely to the discretion of the jury. *McIver v. Gloria*, 140 Tex. 566, 569, 169 S.W.2d 710, 712 (1943).

2. Earning capacity has been defined as the "ability and fitness to work in gainful employment for any type of remuneration, including salary, commissions, and other benefits, whether or not the person is actually employed." *Baccus v. American States Ins. Co. of Texas*, 865 S.W.2d 587, 588 (Tex.App.-Fort Worth 1993, no writ); *Home Indem. Co. v. Eason*, 635 S.W.2d 593, 594 (Tex.App.-Houston [14th Dist.] 1982, no writ). It does not necessarily mean actual wages, income, or other benefits received during the period inquired about. *Baccus*, 865 S.W.2d at 588; *Eason*, 635 S.W.2d at 594–95.

to reasonably measure earning capacity prior to the injury. *King v. Skelly,* 452 S.W.2d 691, 693 (Tex.1970); *City of Houston v. Howard,* 786 S.W.2d 391, 395–96 (Tex.App.-Houston [14th Dist.] 1990, writ denied).

In determining what evidence is sufficient to support a claim of loss of earning capacity, no general rule can be laid down, except that each case must be judged upon its peculiar facts, and the damages proved with that degree of certainty of which the case is susceptible. *McIver v. Gloria,* 140 Tex. at 569, 169 S.W.2d at 712. Consequently, the required certainty will necessarily vary. *Id.* Where the plaintiff is a child, who has never earned any money, the jury must determine the value of the child's lost earning capacity from their "common knowledge and sense of justice." *Id.* Likewise, when the plaintiff is a housewife, the actual monetary value of her services need not be proved. *Id.* However, where the plaintiff is employed at a fixed wage or salary, the amount of his previous earnings ordinarily must be shown. *Id.* Where the plaintiff seeks special damages for loss of earning capacity in a particular business, the amount of his earnings or the value of his services in that business must be shown with reasonable certainty. *Id.* The certainty of the proof required is also affected by the nature of the plaintiff's injuries. *Id.* Thus, if the plaintiff's earning capacity is not totally destroyed, but only impaired, the extent of his loss can best be shown by comparing his actual earnings before and after his injury. *Id.*

A review of the case law best illustrates these concepts. In *McIver v. Gloria,* the plaintiff, a Mexican immigrant farm laborer who could not speak or understand English, sustained injuries from a traffic accident that left him totally incapacitated and unable to earn a living by farming. The evidence of his loss of earning capaci-

ty was an average of the number of bales of cotton he earned for his labor between 1931 and 1937, and some daily wages earned for additional farming work. 140 Tex. at 568, 169 S.W.2d at 711–12. The court upheld the jury's award of loss of earning capacity, even though the exact amounts of his past earnings were not shown, because the evidence of the nature and extent of his farming operations and the kind and amount of the crops he produced provided the jury with sufficient facts to determine the proper amount of damages. 140 Tex. at 569–70, 169 S.W.2d at 712. The court explained that, given the circumstances of the case, the plaintiff was not required to give an exact account of the profits from his farming and to calculate what part of such profits, if any, was due to his individual labor as distinguished from that of the members of his family. 140 Tex. at 569, 169 S.W.2d at 712.

Likewise, in *King v. Skelly,* the court upheld an award of loss of earning capacity when the plaintiff presented no evidence of prior lost earnings, but provided a sufficient alternative monetary measure of his damages. There, the plaintiff, who was injured in a traffic accident, had worked at a variety of jobs, but at the time of his injury was a self-employed welder who had invested in machinery for his business and employed three or four people. He principally worked for one company, and his work included repairing and laying pipelines. There was no evidence of his prior earnings, but he did testify that, before he was injured, he could have had a job as a pipeline welder, and further testified that such welders made $14,000 to $16,000 per year. He also testified that after he was injured he worked for three weeks as a pipeline inspector, but could not continue because driving from site to site was too painful, and that pipeline inspectors earn

$650 per month. On review, the court determined that, despite the lack of evidence of prior earnings, King's testimony as to what he could earn as a welder in the employ of another was a sufficient monetary measure of his earning capacity prior to the date of his accident. 452 S.W.2d at 694.[3]

In contrast, in *Bonney v. San Antonio Transit Co.*, the Texas Supreme Court reversed an award of loss of earning capacity to a plaintiff whose injuries from a traffic accident left him unable to continue his watch repair business. There, the plaintiff failed to introduce either the amount of his earnings prior to injury or a monetary measure of his earning capacity prior to injury. 160 Tex. at 17, 325 S.W.2d at 121. The court held that, in the absence of such evidence and a reason for his failure to introduce such proof, the trial court erred in instructing the jury that they could consider the plaintiff's loss of earning capacity. *Id.* A similar result was reached in *Dallas Ry. & Terminal Co. v. Guthrie*, 146 Tex. 585, 589, 210 S.W.2d 550, 552 (1948), in which the plaintiff, who was seriously injured in a collision between his car and a streetcar, attempted to support his claim for loss of earning capacity with the unsupported speculation and conjecture of his accountant as to the future profits the plaintiff's business would have had. This speculation was based on the accountant's review of records that were neither produced nor accounted for. 146 Tex. at 588–89, 210 S.W.2d at 551–52. The court held that merely looking at the profits that the plaintiff's business earned prior to his injuries, without taking into account other factors such as the character and size of the business, the capital and labor employed in

it, or the nature of the plaintiff's participation in the business, was not sufficient to enable the jury to appraise the value of the plaintiff's personal services. *See* 146 Tex. at 589, 210 S.W.2d at 552. Further, the court held that permitting the accountant to multiply the profits the plaintiff's business made the year before the plaintiff was injured (which were based upon his speculative and unsupported opinions) by the life expectancy of an average man his age, constituted harmful error. *Id.*

▉▉▉ Thus, competent evidence of lost profits may be of probative value in showing diminished earning capacity in a personal injury case. *Popkowsi v. Gramza*, 671 S.W.2d 915, 918 (Tex.App.-Houston [1st Dist.] 1984, no writ); *see also Dallas Ry. & Terminal Co. v. Guthrie*, 146 Tex. at 589, 210 S.W.2d at 552 ("True it is that the loss of profits from a personally operated business may be received in evidence and considered in determining the extent of the injured party's diminished capacity to earn."); Thomas W. Long, *Economic Impairment in Personal Injury Actions*, 30 S. Tex. L.Rev. 397, 408–410 (1989) ("Self-employed individuals such as lawyers, painters, or doctors are best suited to recover special damages for a loss of earning capacity in a particular field by proof of lost profits."). The complaining party must provide data from which the lost profits may be ascertained with a reasonable degree of certainty. *Popkowsi*, 671 S.W.2d at 918.

▉▉▉ However, lost profits alone are not the proper measure of recovery. *Dallas Ry. & Terminal Co. v. Guthrie*, 146 Tex. at 589, 210 S.W.2d at 552; *see also*

---

**3.** In fact, the *King* court noted that the plaintiff's profits from his self-employment would not have been a true measure of his earning capacity because his profits did not result solely from his own personal earning capacity but from three sources: (1) his own labor, (2) the labor of three or four employees, and (3) the return on capital invested in machinery. 452 S.W.2d at 694.

*King v. Skelly,* 452 S.W.2d at 694 (plaintiff's profits from self-employment alone were not a true measure of his earning capacity); *Texas & N.O.R. Co. v. Wood,* 166 S.W.2d at 146–47 (lost profits is but one of the numerous elements which must be taken into consideration in determining the amount of compensation to be paid for loss of earnings sustained by one engaged in the operation of a business). A true measure of earning capacity includes additional factors such as the character and size of the business, the capital and labor employed, and the extent and nature of the plaintiff's own participation in it in order to enable the jury to appraise the value of the plaintiff's personal services. *Dallas Ry. & Terminal Co. v. Guthrie,* 146 Tex. at 589, 210 S.W.2d at 552.[4]

Having concluded that evidence of lost profits is an appropriate consideration, but not the only consideration in a case such as this, we now turn to our review of the jury's award of loss of earning capacity in this case. In doing so, we acknowledge that a legal practice involving contingency fee cases presents somewhat unique characteristics and inherent uncertainties that must be considered in determining what factors should be presented in support of a claim of loss of earning capacity in the past.[5]

When a lawyer takes a case on a contingency fee, he or she generally agrees to represent the plaintiff in return for a percentage of the recovery. The contingency fee agreement may or may not provide that the plaintiff is required to pay expenses and costs associated with the representation, such as expert witness fees, court costs, and copy services. If there is a recovery, the lawyer will share in the amount, which can vary widely depending upon the nature of the case. If there is no recovery, the lawyer receives no payment for his or her services. In addition, contingency fee plaintiffs tend not to be repeat clients, as their cases often involve personal injuries, and the lawyer's ability to attract such clients in the first place is often based upon the lawyer's reputation in the community. All of these factors distinguish Strauss's occupation from that of a lawyer who is paid a salary or even one that charges an hourly fee. *See Houston Belt & Terminal Ry. Co. v. Davis,* 19 S.W.2d 77, 83 (Tex.Civ.App.-Galveston 1929, writ ref'd) (lawyer's recovery for loss of earning capacity supported by difference between pre- and post-injury earnings); *Rowe v. State Farm Mut. Auto. Ins. Co.,* 670 So.2d 718, 731–32 (La.Ct.App. 1996) (tax attorney's past loss earning capacity supported by difference in pre- and post-injury billable hours and rates). In the latter example, evidence of the amount

---

**4.** Strauss asserts that our opinion in *Metropolitan Life Ins. Co. v. Haney,* 987 S.W.2d at 244, instructs that a plaintiff seeking recovery for loss of earning capacity need only show "a physical impairment affecting his ability to earn a living." Strauss appears to confuse the ability to recover loss of earning capacity with proof of damages suffered as a result, which he acknowledges must be proved with reasonable certainty. *McIver v. Gloria,* 140 Tex. at 569, 169 S.W.2d at 712; *Bonney v. San Antonio Transit Co.,* 160 Tex. at 17, 325 S.W.2d at 121.

**5.** We also acknowledge that this area of our law seems, at times, inscrutable. The outcomes in some cases seem at first contradictory to other outcomes. This is, perhaps, the result of the fact-intensive nature of the inquiry in each individual case. Nevertheless, at least one general constant appears, and that is that the proof needed to sustain a jury award seems to vary depending on the nature of the plaintiff's business and the degree of the injuries. When the plaintiff is a farmer who is totally incapacitated, courts have required less exacting information than with a self-employed professional who is only partially incapacitated.

of billable hours and the rate charged per hour would support a claim for loss of earning capacity, but the contingency fee practice is not capable of a similar comparison because of the risks and uncertainties that distinguish it.

■ Here, Strauss did not claim that he could not work on the cases he obtained; he claimed that his ability to obtain maritime plaintiff contingency fee cases from Kosciusko, Mississippi was impaired. Therefore, his theory was not based on a loss of earning capacity of his entire business, or even the loss of his ability to work on cases the business had, but was narrowed to the loss of his personal ability to generate maritime contingency fee cases from plaintiffs in one town. In support of this theory, Strauss apparently chose to rely upon a single factor—the gross legal fees he earned—as probative of his loss of earning capacity. His damage calculations were based solely on his testimony regarding his fees earned, and did not include other presumably available evidence such as the numbers of clients he had represented or the net earnings he made on each case prior to the injury. This testimony, in the absence of additional available evidence, and the absence of any explanation as to why it was not provided, is not sufficient. *See Texas & N.O.R. Co. v. Wood,* 166 S.W.2d at 144–45 (unsupported testimony of plaintiff engaged in livestock commission business as to lost profits could not sustain jury finding of loss of earning capacity in the past when plaintiff failed to provide, among other things, evidence from which the number of transactions handled by his company either before or after his injury or the extent of the gain therefrom could be calculated). Further, it does not appear that Strauss attempted to segregate the fees earned from similar cases from fees earned from other types of cases, but merely testified to his total fees earned each year. Consequently, there is nothing from which a jury could determine the number of maritime cases from Kosciusko that Strauss might have obtained, the likelihood of their successful resolution, or an estimate of the likely recovery from each. Given the inherent uncertainties in contingency fee practice we have described, we believe that some evidence addressing those uncertainties was required in order to demonstrate Strauss's damages to the degree of proof to which they were susceptible.[6]

---

6. We recognize that, in the context of a fee dispute between a lawyer and former client, the Texas Supreme Court has held that lost contingency fees were not reasonably foreseeable and thus are not recoverable. *Stuart v. Bayless,* 964 S.W.2d 920, 921 (Tex.1998) (per curiam). On appeal from the trial court, the First Court of Appeals had upheld an award of $500,000 for the loss of contingency fee work the lawyers claimed they were unable to pursue due to their former client's actions. *Stuart v. Bayless,* 945 S.W.2d 131, 142 (Tex. App.-Houston [1st Dist.] 1996). The lawyers had presented evidence of four specific contingency fee cases they had declined due to cash flow problems resulting from the former client's failure to pay and the time consumed by the litigation against the former client. *Id.* at 141–143. They also testified regarding the expected recovery in the cases and presented expert testimony on the cases' reasonable value. *Id.* at 141–142. On review, however, the Supreme Court reversed the holding, because it found that the damages, which were consequential damages arising from a breach of contract, were not reasonably foreseeable under the facts of the case. 964 S.W.2d at 921. As the court explained, such damages "are not recoverable unless the parties contemplated at the time they made the contract that such damages would be a probable result of the breach." *Id. Bayless* is therefore distinguishable from the present case, in which the plaintiff seeks an award of actual damages for loss of future earning capacity, and therefore a showing of reasonable foreseeability is not required.

Further, as noted above, while Strauss testified to the gross fees he earned prior to and after the incident, in his three damage calculations he failed to include the expenses associated with a contingency fee case.[7] Gross fees alone are not an appropriate basis upon which a jury can determine loss of earning capacity. By not introducing any evidence as to what Strauss's expenses were, he has not put the jury in possession of sufficient evidence as to his loss of earning capacity. *Remuda Oil & Gas Co. v. Nobles*, 613 S.W.2d 312, 318 (Tex.Civ.App.-Fort Worth 1981, no writ) (holding that independent contractor could not prove loss of earning capacity to the degree of certainty to which it was susceptible when no evidence of expenses was shown); *see also Red Arrow Freight Lines, Inc. v. Gravis*, 84 S.W.2d 540, 541–42 (Tex.Civ.App.-San Antonio 1935, no writ) (plaintiff testified only to his gross earnings in his trucking business, and failed to show even approximately what his net earnings were prior to his injury or any evidence of the value of his services to his business). Strauss's net earnings are not just the amounts received, but must include a deduction for expenses incurred. *Id.; see also Holt Atherton v. Heine*, 835 S.W.2d 80, 87 n. 1 (Tex.1992) (correct measure of damages for lost profits is net profits, not gross profits). Strauss's damage models exclude the cost of experts, associates, paralegals, support staff, office expenses, court fees, copy costs, and the myriad other expenses associated with a case, whether or not it is successful, and are therefore insufficient to sustain the jury's finding.[8]

---

7. In *Bayless*, the First Court of Appeals found that lost contingency fee cases are in the nature of lost business, and held that when "a defendant's breach of contract or fraud reduces the volume of the plaintiff's business, but creates no reasonable opportunity for the plaintiff to reduce its general overhead expenses, then the appropriate measure of damages is the amount of lost revenue, without deduction for a portion of the fixed overhead expenses." *Id.* at 140–41. In that case, however, the lawyers testified that their hourly rate cases paid for their "overhead expenses" such as office rent, salaries to employees, payroll taxes, and other fixed costs of doing business; therefore, they considered their contingency fee cases "all profit" and did not include such expenses in their damage calculations. 945 S.W.2d at 141. In contrast, Strauss did not present comparable evidence of specific cases he lost that would have generated additional income; all of his damage theories were based on his gross fees before and after his injury. Consequently, his damage models assume no hourly rate income, only contingency fee income. Further, Strauss does not contend in his briefing that his expenses would have been covered by hourly rate cases in his office; indeed, he does not address the issue of expenses at all.

8. We note that Strauss's damage calculations contained additional insufficiencies. For example, in Strauss's damage model in which he compared his gross fees before and after the injury, he treated all earnings on an "as received" basis, except for a particularly large fee ($1 million), which he treated on an accrual basis. According to Strauss, that was because he did most of the work before the injury but was paid after it. Obviously, consistent accounting would have meant including this fee in Strauss's calculation of his post-injury earnings, but doing so would have resulted in little or no post-injury decline in earnings.

The damage model in which Strauss averaged his annual client fees for the years preceding the accident and then deducted what he would have paid in referral fees to other attorneys in the event that he had relied on them for the referrals is also flawed. First, Strauss did not provide evidence of referral fees actually paid for cases during the period between the date of the incident and the date of trial, which presumably would have been paid if this method of generating business had actually been used. Additionally, the cost of referrals would properly be characterized as an expense, but it was the only expense accounted for in the calculation. Further, as noted above, the model is based on gross fees alone, which does not address the risks and uncertainties built into each individual case,

The record shows that the jury was presented with voluminous evidence of Strauss's tax returns, accounting records and income statements[9] from which the jury possibly could have gleaned some of the evidentiary factors we have described above. But Strauss's testimony regarding his three methods of calculating his lost profits did not include any of these factors, or rely on—or even refer to—these documents. In addition, not only did Strauss not refer to his tax records, a review of the records reveals that they show completely different figures for the relevant years. Thus, his testimony amounted to the type of "naked and unsupported opinion" that cannot support a jury finding on loss of earning capacity. *See Texas & N.O.R. Co. v. Wood*, 166 S.W.2d at 145.

In short, we conclude that Strauss's damages were susceptible to a showing of a higher degree of certainty. As a result, the jury lacked any evidence from which to intelligently determine what the reasonable value of his ability to generate contingency fee cases from Kosciusko was prior to his injury or the amount of any past impairment. *See, e.g., Dallas Ry. & Terminal Co. v. Guthrie*, 146 Tex. at 589, 210 S.W.2d at 552; *Bonney v. San Antonio Transit Co.*, 160 Tex. at 17, 325 S.W.2d at 121; *Remuda Oil & Gas Co. v. Nobles*, 613 S.W.2d at 318; *Texas & N.O.R. Co. v. Wood*, 166 S.W.2d at 145.

Strauss argues that his testimony is sufficient to sustain the jury's award, and that he is not required to quantify his damages at all. In making this argument, he points to his testimony showing that he was unable to engage in his business development activities to the degree he had prior to his injury, and detailing his hospitalization and curtailed work hours. He also cites to two cases involving individuals who were paid on a commission basis, *Mills v. Thomas*, 435 S.W.2d 593 (Tex.Civ.App.-Tyler 1968, writ ref'd n.r.e.), and *Quanah A. & P. Ry. Co. v. Eblen*, 87 S.W.2d 540 (Tex.Civ.App.-Amarillo 1935, writ ref'd).

*Mills* involved an insurance salesman who was injured in a traffic accident. On appeal, the defendant challenged the jury's finding in favor of the plaintiff for loss of earning capacity on the ground that the evidence showed that the plaintiff earned more since the injury than he was making before. The court rejected the defendant's argument, noting there was evidence before the jury that the plaintiff could not devote as much time to his business, which included the solicitation of applications for insurance, as he had done before. *Mills*, 435 S.W.2d at 599. Continental has made

---

but assumes Strauss would have obtained a full recovery on all cases referred while incurring no expenses other than the referral fee.

Strauss's third model, in which he adjusted his average gross fees earned after the incident by 40%, representing the percentage of disability he claimed based on medical testimony, is also flawed because it incorrectly assumed that the degree of his physical impairment is necessarily synonymous with his diminished capacity to work and earn money. As noted in *Riley v. Norman*, 275 S.W.2d 208, 209 (Tex.Civ.App.-El Paso 1954, writ ref'd n.r.e.), diminished capacity to work and earn money may and ordinarily does result from physical impairment, but physical impairment does not necessarily result in diminished capacity to work and earn money; it depends on the nature of the impairment and the nature of the work.

9. Continental introduced Strauss's income statements for the years 1990 through 1997, and partial records for 1998 and 1999. On appeal, Continental argues that this evidence demonstrates that Strauss's income actually increased after his injury; however, that alone is not determinative because the fact that an injured party may work and earn as much or more than he did before he was injured does not bar him from recovering for loss of earning capacity. *Mikell v. LaBeth*, 344 S.W.2d 702, 707 (Tex.Civ.App.-Houston 1961, writ ref'd n.r.e.).

the same argument, which we have rejected. *See Mikell v. LaBeth,* 344 S.W.2d at 707. We do not find *Mills* supportive of Strauss's argument because the issue of whether the plaintiff had proved his damages to the degree to which they were susceptible was not before the court. As a result, the opinion does not reveal any details of the damages proof other than to state that the plaintiff presented proof of his earnings before and after the accident.

The *Quanah* case, which we note is a "writ refused" case and thus is equivalent to a Texas Supreme Court opinion, also is not helpful to Strauss. There, the plaintiff sold products for a petroleum company on commission prior to sustaining serious, debilitating injuries to his left arm and shoulder when his truck collided with a train. As a result of the accident, his arm was left more than one inch shorter than it had been, and he was unable to handle heavy merchandise without assistance. 87 S.W.2d at 542. In determining whether there was evidence to support an award of loss of earning capacity, the *Quanah* court noted that the plaintiff earned a commission of four or five hundred dollars per month before he was injured and, after he was injured he had to employ additional help at a cost of $85 per month, and his business suffered because "he was unable to get out and solicit business and the help he hired did not and could not solicit business as successfully as the plaintiff did

himself." *Id.* at 543. The court found that the amount of the plaintiff's lost earnings was not susceptible of exact proof, noting that in addition to his injuries, there were other elements (such as a drought and the general economic conditions) that would affect the amount of his commissions. *Id.* On these facts, the court upheld the jury's award of damages. *Id.*

While we also find in the present case that Strauss's loss of earning capacity is not susceptible of exact proof, we have no similar evidence of Strauss's actual earnings or his expenses to consider. In addition, as we have stated, we think that Strauss's particular claim of loss of earning capacity, based solely on the theory that his diminished ability to engage in marketing activities in *Kosciusko* prevented him from obtaining contingency fee maritime cases, was susceptible of greater proof than was presented.[10]

Nevertheless, our opinion should not be read as endorsing the strict level of proof Continental argues should be required when a lawyer who takes contingency fee cases attempts to demonstrate loss of earnings in the past. Had Strauss presented evidence of the number of plaintiff maritime cases he obtained annually, the number of those cases that resulted in a money judgment, and the net profits actually obtained from each case before and after the incident, the outcome of the case

10. In further support of his claim that he need not quantify his damages, Strauss also cites *McElroy v. Luster,* 254 S.W.2d 893 (Tex. Civ.App.-Fort Worth 1953, writ ref'd), in which the court upheld an award of loss of earning capacity to a farmer who was injured in an accident. We note, however, that in that case there was evidence that the farmer had averaged $1400 per year in *net* profits in the seven years prior to his injuries, *id.* at 897, as distinguished from the gross profits presented by Strauss. In addition, the farmer's injuries were severely disabling, and he testified that he suffered progressively increasing pain when he tried to work. *Id.* The court tracked the language of the factually similar case of *McIver v. Gloria* in holding that in this circumstance the jury was able to fairly estimate the farmer's loss of earning capacity even though the amounts of his past earnings were not shown "with mathematical exactitude." *Id.* at 898. *McElroy* is thus distinguishable on its facts, and we find nothing in the opinion that is contrary to the authorities we have cited in support of our resolution of this issue.

might well have been different.[11] We do not suggest that such evidence is the exclusive means by which a lawyer may support a claim for loss of earning capacity in the past, but believe that evidence of this type better addresses the inherent uncertainties and risks of contingency fee practice.

We therefore overrule Strauss's sole issue on appeal, sustain the trial court's grant of Continental's JNOV on the award of loss of earning capacity in the past, and turn to Continental's cross-appeal.

## CONTINENTAL AIRLINES' CROSS-APPEAL

Continental raises three issues on cross-appeal. First, Continental contends that the trial court erred in denying its motions for new trial and mistrial on the ground that Strauss engaged in improper communications with the jurors during their deliberations. In its second and third issues, Continental complains about the exclusion of certain treatment records and expert psychiatric testimony regarding Strauss's psychological condition.

### 1. Improper Communications with Jurors

Continental asserts that it is entitled to a new trial in this matter because Strauss communicated to some of the jurors during the deliberation phase of the trial about the supposed hardships imposed on him and his family as a result of the incident and the lawsuit. Continental claims that, in this situation, harm must be presumed to have occurred to the deliberative process. While we do not in any way condone the contact between Strauss and the ju-

rors, we disagree with Continental's position and overrule its first issue.

#### a. Background

The parties hotly dispute each other's characterization of the events at issue; therefore, we will set out the facts as developed in the record. The case was submitted to the jury late in the day on Tuesday, August 11, 1999, and the jury continued deliberating through Wednesday, Thursday, and into Friday. It appears that, shortly before the deliberations began on Thursday, Strauss had a conversation with a juror, William Cade. On Friday morning, Cade reported the incident to the bailiff, and the trial court held a hearing in chambers at which Strauss, Cade, and the parties' counsel were present. Cade testified that Strauss approached him and, after exchanging greetings, tried to engage him in conversation. Cade stated that he commented that the wait must be hard on Strauss, and Strauss replied that the last five years had been hard on him and his family, and if there is an appeal it will be hard on his family again. At that point, Cade testified, the bailiff intervened. When the trial court asked if Cade had completed his statement, he replied that he had, and after repeating his recollection of the events, confirmed that he could recall nothing else. Cade also stated that he mentioned the contact to three or four of the other jurors and told them that the contact had made him uncomfortable, but did not provide them the details of the contact.[12] He also said he thought Strauss had given another juror named Rhonda his card.

The trial court then excused Cade, and called juror Rhonda Dick. Dick testified

---

11. We express no opinion regarding the type or sufficiency of evidence that may be required to prove loss of earnings in the future.

12. The trial court then asked Cade what impact the contact with Strauss would have on his ability to be fair and impartial, and Cade admitted that he became angry because he thought it was an attempt to manipulate him.

that she had merely exchanged greetings with Strauss and denied that he had given her his business card. She testified that Strauss was often in the hallway smiling and nodding at the jurors during breaks. In response to the trial court's inquiry into whether she was aware of Strauss having any conversations with any other jurors during the deliberations, Dick stated that during a break one of the jurors had said something about a vacation, and Strauss, who was standing nearby, said something to the effect that he and his wife had not taken a vacation yet. She also confirmed that Cade had not discussed the specifics of his contact with Strauss with the other jurors, although she knew that he was upset about it.[13] The trial court's inquiry was then concluded. Continental made no motion at that time.

By midday on Friday, the jury reached a 10–2 verdict against Continental. Cade was one of the two dissenting jurors. After the verdict was read, and immediately after Strauss's counsel moved that the verdict be accepted, counsel for Continental requested a mistrial. The trial court stated "You need to do that at this time to preserve your error, and you've done so," and took the matter under advisement, noting that Continental had made the motion before the verdict had been accepted. After the jury was dismissed, counsel for Strauss asked that the presiding juror, Susan Jett, testify as to her understanding of the contacts with Strauss. In response to the trial court's questions, Jett testified that she was not personally aware of any conversations between Strauss and jurors beyond casual greetings, but had heard of

that happening. She also stated that she had no conversations with Strauss.[14] In response to questioning from Continental's counsel, Jett testified that she had seen Strauss pacing near the jurors while they were talking during a break, and heard comments about vacations, including a comment by Strauss that he had not had a vacation this summer. She was then excused.

The trial court then asked Strauss to take the stand and questioned him about any conversations he might have had with any jurors. Strauss testified that he had not had any conversations with any jurors that he could remember other than Cade. He explained that he was pacing up and down in the hallway when Cade initiated contact with him. According to Strauss, Cade commented that it had been a long time, and Strauss replied, "yeah, a long four years." He denied any comment about an appeal or the merits of the case. Strauss stated that another juror who was nearby made a general comment that he could not remember, and at that time he began to move away as the bailiff came to escort him away. Strauss denied speaking to any other jurors or handing any jurors his card. He also testified that he did not remember Jett's comments about summer vacation. The hearing then concluded. The verdict was filed that same day, August 13, 1999.

On August 25, 1999, Continental filed a motion for mistrial and motion for new trial, in which it included affidavits from Cade and another juror, Beatrice Powell. In his affidavit, Cade provided additional

---

**13.** The trial court also inquired into whether the incident had affected Dick's ability to be fair and impartial, and she initially stated "no, not really," but then stated "the more I think about it, as I have just ten minutes ago, you know, [it] could have an effect on me."

**14.** In response to a question from Strauss's counsel, Jett denied that her deliberations were affected by anything Cade had related to her about his contact with Strauss. Counsel then obtained testimony from Jett regarding Cade's demeanor during the deliberations and the substance of the deliberations.

details of his conversation with Strauss that he had recalled "after further reflection." He stated that Strauss approached him while he was sitting on a bench waiting to be admitted to the jury room, and remarked that one of the plaintiff's witnesses, Walter Cauthen, was a welder, and that he thought that Cade could relate to Cauthen because of the similarity of their occupations. After Cade remarked that it must be hard waiting for the jury to decide, Strauss stated that it was difficult on him and his family because the case had been going on since 1995, and any appeal of a verdict in the case would also take a long time and add to the hardship on him and his family. Cade further stated that he thought it was inappropriate for Strauss to have discussed those matters with him, and felt that Strauss was trying to influence the jury deliberations.

Powell, who had voted in favor of the verdict, stated in her affidavit that one morning she was in the courtroom visiting with the jurors, and Strauss was in close proximity to them, as he "often was when the jury was in the hallway outside the courtroom." She stated that Strauss was "walking back and forth, smiling at us." When one of the jurors made a comment about vacation, Strauss, who was standing near the jurors, "made a remark to the group to the effect that he and his wife had not had a vacation since the accident." She further stated that she "felt like [Strauss] was trying to get friendly and I made no response to his comment."

On November 19, 1999, at the hearing on Continental's motions for mistrial and new trial, Continental's counsel called the bailiff of the court to testify. He testified that he saw Strauss and Cade engaging in conversation, but he did not hear the substance of the conversation. He then escorted Strauss away, admonished him not to have contact with the jurors beyond casual greetings, and advised the trial court of what he had seen. Counsel for Strauss then called Jett to the stand and asked, among other things, whether there was any improper influence improperly brought to bear upon any juror, and Jett replied, "no." On cross-examination by Continental's counsel, Jett testified that, while she was aware of the admonition regarding contact with jurors, she did not tell the bailiff about the vacation conversation because she thought Strauss had merely made a comment in passing. Toward the conclusion of the hearing, the trial court stated that it considered Strauss's conduct "appalling" and an embarrassment to the profession.

On May 2, 2000, the trial court signed an order denying Continental's motions for mistrial and new trial, and granting the JNOV discussed in the previous section. The trial court also signed the judgment that same day, awarding Strauss $362,596.50 and pre-judgment interest.

Continental subsequently filed a post-judgment motion for new trial on the grounds of the improper jury contact and the exclusion of psychiatric evidence and testimony. On July 12, 2000, the trial court conducted a hearing on the motion, at which it made findings of fact in open court that there was juror contact and it was material contact about the case. However, the court also found that the evidence showed that no harm resulted, whether or not harm was presumed.

b. *Analysis*

We note initially that Strauss complains that Continental has waived its right to complain about the denial of its motion for mistrial because it failed to object after the trial court's hearing in chambers, and failed to obtain a ruling on its motion when the court announced it would take the matter under advisement.

*See Melendez v. Exxon Corp.,* 998 S.W.2d 266, 279 (Tex.App.-Houston [14th Dist.] 1999, no pet.); *Alamo Carriage Serv., Inc. v. City of San Antonio,* 768 S.W.2d 937, 943 (Tex.App.-San Antonio 1989, no writ); *Bagwell v. Skytop Rig Co.,* 468 S.W.2d 939, 943–44 (Tex.Civ.App.-Corpus Christi 1971, writ ref'd n.r.e.); *Insurors Indemnity & Ins. Co. v. Brown,* 172 S.W.2d 174, 176–77 (Tex.Civ.App.-Beaumont 1943, writ refused). In the present case, however, Continental obtained significant additional details of Strauss's contacts with Cade and the other jurors after the verdict was filed, as reflected in the affidavits of Cade and Powell. These affidavits cannot simply be dismissed as untrue or irrelevant, particularly given the trial court's findings of material misconduct. Given these facts, we find Strauss's authorities distinguishable. *See Melendez,* 998 S.W.2d at 279 (sleeping juror observed during trial); *Alamo Carriage,* 768 S.W.2d at 943 (parties informed of juror conduct three days before verdict was returned); *Bagwell,* 468 S.W.2d at 943–44 (circumstances surrounding witness-juror contact were fully developed and there was no showing of subsequent jury misconduct); *Insurors Indemnity,* 172 S.W.2d at 176–77 (juror sitting with wife of plaintiff during a portion of the trial was observed without complaint prior to verdict). Accordingly, we hold that Continental did not waive its right to seek a mistrial.

■ Turning to the merits of Continental's motions for mistrial and new trial, at the beginning of trial and as the proceedings continued, the trial court instructed the jurors and the participants in accordance with the approved jury instructions as follows:

> Do not mingle with nor talk to the lawyers, the witnesses, the parties or any other person who might be connected with or interested in this case, except for casual greetings. They have to follow the same instructions and you will understand it when they do.

*See* Tex.R. Civ. P. 226a. As the court found, however, Strauss, a lawyer licensed in several states including Texas, violated this instruction and engaged in conversation with jurors during deliberations on matters material to the case. Continental's complaint regarding Strauss's conduct is governed by Texas Rule of Civil Procedure 327(a), which provides, in pertinent part, as follows:

> When the ground of a motion for new trial, supported by affidavit, is misconduct of the jury ... or because of any communication made to the jury, ... the court shall hear evidence thereof from the jury or others in open court, and may grant a new trial if such misconduct proved, or the communication made, ... be material, and if it reasonably appears from the evidence both on the hearing of the motion and the trial of the case and from the record as a whole that injury probably resulted to the complaining party.

Tex.R. Civ. P. 327(a). Jury misconduct includes outside influence on jurors. *Wooten v. Southern Pacific Transp. Co.,* 928 S.W.2d 76, 78 (Tex.App.-Houston [14th Dist.] 1995, no writ). "Outside influence" has been held to mean information coming from outside the jury, i.e., from a non-juror who introduces information to affect the verdict, and not from within the jury's deliberations or as part of the jury's mental process. *Id.* at 78–79.

■ To warrant a new trial for jury misconduct, Continental had the burden to prove that (1) there was misconduct; (2) it was material; and (3) probably caused injury. *See Golden Eagle Archery, Inc. v. Jackson,* 24 S.W.3d 362, 372 (Tex.2000). Whether misconduct occurred is a question of fact for the trial court, and if there is

conflicting evidence on this issue the trial court's finding must be upheld on appeal. *Id.; Pharo v. Chambers County, Texas,* 922 S.W.2d 945, 948 (Tex.1996). Misconduct justifies a new trial only if it reasonably appears from the record that "injury probably resulted to the complaining party." *Pharo,* 922 S.W.2d at 950. To show probable injury, there must be some indication in the record that the alleged misconduct most likely caused a juror to vote differently than he would otherwise have done on one or more issues vital to the judgment. *Id.* Determining the existence of probable injury is a question of law. *Id.*[15]

■ Here, the trial court found that there was misconduct and it was material, but Continental was not harmed. As illustrated above, the facts were hotly disputed. First, while Strauss testified that he made a comment to Cade to the effect that it had been "a long four years," he denied making any comment about an appeal. In his affidavit, Cade stated that Strauss made a remark to him about Cade being a welder like the witness, Walter Cauthen, which Strauss denied. Further, Strauss testified that Cade was the only juror he spoke to. Strauss denied joining in jurors' conversations in the hallway as Powell stated in her affidavit, and did not recall presiding juror Jett making any comment about a vacation, in conflict with her testimony. Strauss admitted pacing in the hallway outside the courtroom, but denied that he was attempting to influence the jurors. Because the evidence is conflicting, we will not disturb the trial court's findings of material misconduct.

We next turn to the question of probable injury. Citing *Texas Employers' Ins. Ass'n v. McCaslin,* 159 Tex. 273, 274, 317 S.W.2d 916, 921 (1958), Continental does not put forth evidence of probable injury, but asks us to find that the misconduct at issue is so egregious that we must presume harm. Further, Continental urges that the jurors' answers to questions regarding whether the outside influence affected their verdict may not be considered; rather, harm must be inferred from the acts themselves. 159 Tex. at 276–77, 317 S.W.2d at 919–20 (noting that it has repeatedly been held that a juror's mental processes may not be probed).

■ As stated above, Rule 327(a) places the burden on the complaining party to demonstrate material misconduct that probably caused injury. *Pharo,* 922 S.W.2d at 950. Further, to show probable injury, there must be some indication in the record that the alleged misconduct most likely caused a juror to vote differently on one or more issues vital to the judgment. *Id.* Nevertheless, Continental strenuously urges that this case falls within the exception articulated in *McCaslin,* in which the Texas supreme court held that, despite the requirements of Rule 327, there are some types of misconduct that are "so highly prejudicial and inimical to fairness" that the burden of proving probable injury is met, *prima facie* at least, by simply showing the improper act and nothing more. 159 Tex. at 279, 317 S.W.2d at 921. Additionally, Continental urges that harm must be inferred here because it is wholly inappropriate to ask jurors whether improper conduct affected them.

---

15. In the Texas Supreme Court's more recent decision in *Golden Eagle Archery,* the court stated that whether misconduct caused injury is a question of fact. *See* 24 S.W.3d at 372 ("Whether misconduct occurred and caused injury is a question of fact for the trial court."). However, it appears that despite this statement, the *Golden Eagle Archery* court conducted a *de novo* review of the trial court's decision, and therefore the decision can be harmonized with the *Pharo* opinion.

In *McCaslin*, the plaintiff went to the business office of one of the jurors during trial, engaged her in conversation, and then ended the conversation by saying "[b]e sure and do all you can to help me" or something similar. *Id.* at 918. The court equated the plaintiff's action to jury tampering, and stated that the Texas Constitution's provision that the right of trial shall remain inviolate meant that a trial by a jury must be "unaffected by bribes, promises of reward, and improper requests to 'do all you can to help me.'" 159 Tex. at 275–76, 317 S.W.2d at 918. Consequently, the court held that probable prejudice was shown as a matter of law based on the plaintiff's action. 159 Tex. at 279, 317 S.W.2d at 921–22.

Here, Continental contends that, like the conduct in *McCaslin*, Strauss's conduct amounts to jury tampering that can only be remedied by a new trial. In support of its contention, Continental relies heavily on the testimony and affidavit of Cade. However, even assuming Strauss made all of the comments Cade attributed to him, which is disputed, we note that Cade did not vote in favor of the verdict. Therefore, no harm could have resulted to Continental from Strauss's contact with Cade. Further, we do not find that the remaining conduct of which Continental complains—the disputed "vacation" comments and Strauss's pacing in the hallway near the jury—warrant overturning the trial judge's decision and ordering a new trial. Given these facts, we decline to find that Strauss's conduct, while deplorable for an attorney licensed in this state, is so highly prejudicial and inimical to a fair trial that probable injury can be assumed. Further, we have carefully examined the record, but are unable to find any indication that the misconduct most likely caused a juror to vote differently on one or more

issues vital to the judgment. *See Pharo*, 922 S.W.2d at 950. Accordingly, we find that the trial court did not err in denying Continental's motions for mistrial and new trial.

We reach our conclusion without regard to the jurors' testimony regarding whether the alleged misconduct influenced their verdict. Our finding thus obviates the need to address Continental's argument that the court may not properly consider such evidence. We note, however, that Continental's argument implicates both Rule 327(b) and Texas Rule of Evidence 606(b). Under these rules, juror testimony is permitted on the issue of juror misconduct and communications to the jury, provided such testimony does not require delving into deliberations. *Golden Eagle Archery*, 24 S.W.3d at 372.

Continental's first issue is overruled.

### 2. Exclusion of Evidence

In Continental's second and third issues, it contends that the trial court erred in excluding certain evidence relating to Strauss's psychological condition. Specifically, Continental's second issue complains that the trial court erred in excluding records of psychiatric treatment by Dr. Steve Taylor, Strauss's treating psychiatrist, and treatment records of Greenbrier Psychiatric Hospital, where Taylor treated Strauss in 1991. Continental wanted these records before the jury (1) in order to refute Strauss's contention that manic depression was his only psychiatric problem on the day of the incident and (2) to impeach his credibility. Continental's third issue involves the trial court's exclusion of the testimony of Continental's expert psychiatric witness, Dr. Byron Howard, on Strauss's psychiatric history and its effect upon his behavior during the incident and

thereafter.[16] We will discuss both issues together.

Strauss argues that Continental's discussion of these points of error does not cite to authority, and does not identify the location in the record where the documents were offered and where it secured an adverse ruling. Accordingly, Strauss claims the issues are waived. Although Continental does not cite to supportive authority or the applicable evidentiary rules in its main brief, it does cite to the record for most of its discussion of the evidence. Therefore, we will address Continental's complaint.

■■■ The admission and exclusion of evidence is committed to the trial court's sound discretion; thus, we review under an abuse-of-discretion standard. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995). As with rulings on evidence generally, the exclusion of expert testimony is reviewed only for abuse of discretion. *K–Mart Corp. v. Honeycutt,* 24 S.W.3d 357, 360 (Tex.2000). A court abuses its discretion only when it acts in an unreasonable and arbitrary manner, or when it acts without reference to any guiding principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). A trial court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex.1998); Tex.R. Evid. 403. We must uphold the trial court's evidentiary ruling if there is any legitimate basis for it. *Owens–Corning Fiberglas,* 972 S.W.2d at 43. We will not reverse a trial court for an erroneous evidentiary ruling unless the error probably caused the rendition of an improper judgment. *Id.; see also* Tex. R.App.P. 44.1.

The gist of Continental's complaint about the exclusion of the evidence it sought to present is that it was relevant to the jury's consideration of Strauss's psychological condition at the time of the incident, his credibility, and his damage claims. Continental contends that one of Strauss's themes throughout the trial was that Strauss suffered from manic depression (sometimes referred to by the parties as a bipolar condition) that was successfully treated with medication and was under control at the time of the incident. Continental wanted to introduce the psychiatric treatment records and testimony to show that in fact Strauss had a second condition, a narcissistic personality disorder that was not cured and would have affected his behavior during the incident, to impeach Strauss's testimony about his condition and his actions.

In response, Strauss argues (among other things) that the trial court was within its discretion to exclude the evidence because it was irrelevant, any probative value it had was outweighed by its prejudicial effect, and it was properly excluded under Texas Rule of Evidence 404 as inadmissible evidence of a character trait. Strauss also argues that Dr. Howard's testimony regarding Strauss's condition in 1991 would not have assisted the jurors, who had the opportunity to hear numerous versions of the incident from different witnesses, including Strauss, and had ample opportunity to judge Strauss's credibility during direct and cross-examination. Further, Strauss contends that Continental failed to establish, or even address, whether it was harmed by the exclusion of the testimony.

**16.** While it is unclear from the record, it appears that Continental's offer of the treatment records was made in conjunction with the offer of Dr. Howard's testimony, as Continental asserted that Howard had reviewed the records in forming his opinions.

We agree that the trial court did not abuse its discretion in excluding Dr. Howard's testimony and the 1991 treatment records upon which it was based. Strauss testified that he had a bipolar disorder, that he received treatment at Greenbrier Hospital for it, and that he was treated by Dr. Taylor for several years thereafter. We do not believe that additional evidence detailing Strauss's psychiatric condition would have assisted the jury in judging Strauss's credibility or Continental's liability for the incident.

Additionally, the treatment records and evidence Continental sought to offer were based on Strauss's condition as of 1991, four years before the date of the accident, and the trial court could reasonably have found that Dr. Howard's opinion, based solely upon a review of Strauss's treatment records, was too remote in time to be of value, and any relevance would have been outweighed by its prejudicial effect. With regard to any harmful error resulting from the exclusion of the evidence, even if we assume that the evidence was not cumulative, as Continental urges, we do not find that the evidence was controlling on a material issue or that its exclusion probably caused the rendition of an improper judgment. *See* Tex.R.App. P. 44.1. Whether Strauss suffered from one, or more than one, specific psychiatric condition four years prior to the incident was not a controlling issue in this personal injury case, and Continental has failed to offer any support for a claim of harmful error resulting from the exclusion of the evidence. We therefore overrule Continental's second and third issues.

The judgment of the trial court is affirmed.