Affirmed
and Opinion filed September 10, 2009.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-08-00399-CV

____________

 

ORVILLE LOSIER AND WIFE JOELLE
LOSIER,
Appellants

 

V.

 

SHIVARAJPUR K. RAVI, M.D. AND
AMBIKA MEDICAL GROUP, P.A., Appellees

 



 

On Appeal from the 129th
District Court

Harris County, Texas

Trial Court Cause No. 2006-21824

 



 

O P I N I O N

Appellants Orville and Joelle Losier
appeal a unanimous jury verdict in favor of appellees Shivarajpur K. Ravi, M.D.,
and Ambika Medical Group, P.A., on the Losiers=
medical-malpractice claims.  The Losiers contend that the trial court erred by
refusing a res ipsa loquitur jury instruction and by denying a motion
for new trial based on juror misconduct.  We affirm.








I

After an automobile accident in 2002,
Orville Losier was referred to Dr. Ravi for pain management.  To treat Mr.
Losier=s lower-back pain,
Dr. Ravi performed an IDET procedure on two levels of Mr. Losier=s spine, the L4-L5
and L5-S1.  The IDET procedure, or intradiscal electrothermic therapy, involves
placing a catheter into a disc and heating the disc to stop its fluid center
from leaking.  A needle is used to introduce the catheter into the disc, and
the physician watches the catheter=s progress by
viewing fluoroscopic x-ray images on a monitor. Dr. Ravi completed the
procedure at level L4-L5, but at level L5-S1, after introducing the needle, he
encountered difficulty manipulating the catheter.  At some point, the catheter=s tip sheared or
broke off in Mr. Losier=s disc, and Dr. Ravi decided to leave it
there.  Dr. Ravi later told Mr. Losier what had happened and that he believed
that surgery to remove the catheter tip was unnecessary.  Mr. Losier continued
treatment with Dr. Ravi for about a year, and after that he began seeing
another pain-management specialist, Dr. Syed.  According to Dr. Syed, Mr.
Losier reported that his back pain was getting Aexcruciatingly
worse@ since the
catheter piece had been left in his disc.  

In 2006, the Losiers sued Dr. Ravi and
Ambika Medical Group for negligence, gross negligence, malice, and loss of
consortium.  The Losiers sought unspecified damages for, among other things,
physical pain and suffering, mental anguish, medical expenses, disfigurement,
physical impairment, and loss of earnings and earning capacity in the past and
in the future.  Relevant here, the Losiers= pleadings
included an assertion of res ipsa loquitur for leaving a piece of
medical equipment in Mr. Losier. 

In October 2007, the case was tried to a
jury.  After the defense rested, the Losiers objected to the trial court=s charge on the
ground that it did not include an instruction on res ipsa loquitur.  The
Losiers also submitted an instruction on res ipsa loquitur which the
trial court denied.  After deliberations, the jury returned a unanimous verdict
in favor of the defendants. 








The Losiers then filed a verified motion
for mistrial or, in the alternative, verified motion for new trial, in which
they contended that (1) the jury should have been instructed on the doctrine of
res ipsa loquitur, and (2) a new trial should be granted because of jury
misconduct and tampering.  The second contention was supported by the affidavit
of a paralegal for the Losiers= attorneys who averred that she saw the
defense counsel=s paralegal and Dr. Ravi=s insurance
representative conversing with a juror for at least ten minutes while on a
lunch break during the trial.  Following a hearing in which the trial court
heard evidence on the juror misconduct allegation, the trial court denied the
Losiers= motions.  On
February 21, 2008, the trial court signed a final judgment in favor of the
defendants.  This appeal ensued.[1] 


II

In their first issue, the Losiers contend
that the trial court abused its discretion by failing to instruct the jury on res
ipsa loquitur and that this failure likely led to an improper jury
verdict.  Specifically, the Losiers contend that res ipsa loquitur
applies because this case involves negligence in the use of mechanical
instruments and in leaving surgical instruments or sponges in the body.  We
review the trial court=s refusal to submit an instruction for
abuse of discretion.  See Plainsman Trading Co. v. Crews, 898 S.W.2d
786, 791 Tex. 1995); Weidner v. Sanchez, 14 S.W.3d 353, 369 n.3 (Tex.
App.CHouston [14th
Dist.] 2000, no pet.).








Res ipsa loquitur applies to
situations in which two factors are present:  (1) the character of the accident
is such that it would not ordinarily occur in th absence of negligence, and (2)
the instrumentality causing the injury is shown to have been under the
management and control of the defendant.  Haddock v. Arnspiger, 793
S.W.2d 948, 950 (Tex. 1990); Scott v. Beechnut Manor, 171 S.W.3d 338,
343 (Tex. App.CHouston [14th Dist.] 2005, pet. denied).  It is not a
separate cause of action from negligence; rather, it is a rule of evidence by
which the jury may infer negligence.  Haddock, 793 S.W.2d at 950.

In medical-malpractice cases, res ipsa
loquitur is limited to those cases in which the doctrine had been applied
as of August 29, 1977.  See Tex. Civ. Prac. & Rem. Code Ann. ' 74.201 (Vernon
2005); Haddock, 793 S.W.2d at 950; Scott, 171 S.W.3d at 343. 
Further, the doctrine applies only when the nature of the alleged malpractice
and injuries are plainly within the common knowledge of laypersons, requiring
no expert testimony.  Haddock, 793 S.W.2d at 951; Ruiz v. Walgreen
Co., 79 SW.3d 235, 239 (Tex. App.CHouston [14th
Dist.] 2002, no pet.).  The three recognized areas in which res ipsa
loquitur applies to medical-malpractice claims are (1) negligence in the
use of mechanical instruments, (2) operating on the wrong portion of the body,
and (3) leaving surgical instruments or sponges in the body.  Haddock,
793 S.W.2d at 951; Scott, 171 S.W.3d at 338. 

The Losiers argue that the evidence at
trial demonstrated that the catheter was not defective and that Mr. Losier, in
his sedated state, did nothing to cause the catheter to break.  Additionally,
the Losiers contend, despite Dr. Ravi=s denial that the
catheter was under his Aexclusive control,@[2] both the Losiers= and Dr. Ravi=s experts agreed
that the catheter and needle were under his exclusive control.  The Losiers
further assert that the evidence excluded all possible causes of the catheter
breaking Asave for Dr. Ravi=s vigorous
manipulation of the catheter, and then his attempt to pull the bent catheter
back through the needle.@  Therefore, they conclude, the evidence
shows that the two factors necessary to apply res ipsa loquitur are
present.  See Haddock, 793 S.W.2d at 950.








But as the case law makes clear, the
doctrine does not apply to those cases in which the use of the mechanical
instrument is not a matter within the common knowledge of laypersons.  See
Haddock, 793 S.W.2d at 951; Scott, 171 S.W.3d at 338.  The evidence
showed that the IDET procedure involves the placement of a catheter into a
person=s disc to heat the
disc to prevent the fluid inside the disc from leaking out.  After the needle
is inserted into the disc, the wire bends around and into the disc.  The
physician performing the procedure uses fluoroscopic guidance to guide the
catheter.  The physician must take a course to become qualified to perform the
IDET procedure.  

Further, the Losiers= expert, Dr.
Ackerman, explained that when Dr. Ravi encountered difficulty in manipulating
the catheter inside the disc, what he should have done next was Areally hard to say@ and Aa judgment call.@  He went on to
explain that it is customary to gently manipulate the catheter to get around the
obstruction.  Dr. Ackerman also opined that, when the catheter is bent around
the needle tip, the standard of care is to withdraw the needle and the catheter
at the same time.  In this case, he opined, Dr. Ravi attempted to pull back the
catheter only, causing the needle to shear off the catheter=s tip.  Contrary
to Dr. Ackerman, Dr. Ravi=s expert, Dr. Dai, opined that the
catheter became stuck in a fissure, and there was no way to free it.  She
opined that Dr. Ravi did nothing negligent that caused the catheter to become
stuck in a fissure.  Dr. Dai also testified that a catheter can break despite
the use of ordinary care.  Both Dr. Ackerman and Dr. Dai agreed that the fact
that the catheter broke did not indicate that Dr. Ravi used excessive force
when manipulating the catheter. 








The evidence concerning the IDET procedure
generally and Dr. Ravi=s use of the needle and catheter when
performing the IDET procedure on Mr. Losier demonstrates that the nature of the
alleged malpractice is not a matter plainly within the common knowledge of
laypersons.  See Haddock, 793 S.W.2d at 951; Scott, 171 S.W.3d at
338.  The courts have held that many medical procedures involving mechanical
instruments, some arguably less specialized than the IDET, fall outside the
narrow application of res ipsa loquitur.  See, e.g., Haddock,
793 S.W.2d at 954 (use of flexible colonoscope during proctological examination);
Scott, 171 S.W.3d at 343B44 (operation of ventilator); Wendenburg
v. Williams, 784 S.W.2d 705, 706B07 (Tex. App.CHouston [14th
Dist.] 1990, writ denied) (use of pituitary rongeur); Spinks v. Brown,
103 S.W.3d 452, 459 (Tex. App.CSan Antonio 2002, pet. denied) (insertion
of Foley catheter); Williford v. Banowsky, 563 S.W.2d 702, 705B06 (Tex. Civ. App.CEastland 1978,
writ ref=d n.r.e.) (use of
high-speed rotary instrument in dental treatment).  Thus, this is not a case in
which the category of negligence in the use of mechanical instruments applies.

Moreover, we are not persuaded that this
case falls into the category of leaving a surgical instrument or sponge in the
body.  In Traut v. Beaty, the court noted that Ares ipsa loquitur cannot be applied
in every case in which an object is left in a patient=s body@ because to do so
would Amake the exception
the rule.@  75 S.W.3d 661, 667 (Tex. App.CTexarkana 2002, no
pet.).  The court reasoned that this conclusion Afollows logically
from the rule that res ipsa loquitur is inapplicable in medical malpractice
cases, except when the nature of the alleged malpractice and injuries are
plainly within the common knowledge of lay people.@  Id. at
666.  In Traut, a physician left part of a wire in the patient=s breast after
performing a hook-wire needle localization procedure on her.  Id. at
663.  The court rejected the argument that res ipsa loquitur applied,
reasoning that the evidence showed that whether the physician=s decision to
leave the piece of wire in the patient was justified and whether a causal
connection existed between the presence of the wire and the patient=s pain were not
matters plainly within the knowledge of lay people.  Id. at 667B68.








The Losiers rely heavily on another case, Steinkamp
v. Caremark, to support their contention that the trial court erred in
refusing the requested instruction.  See 3 S.W.3d 191 (Tex. App.CEl Paso 1999, pet.
denied)  In that case, a catheter disintegrated inside the vein of a pregnant
patient=s arm, requiring
her to undergo surgery to remove the catheter fragments without anesthesia.  Id.
at 193.  The Steinkamp court concluded that the case was Aone of those rare
medical malpractice exceptions where res ipsa loquitur applies@ because A[t]he nature of
the alleged malpractice and injuries involves [the nurse=s] act of leaving
one piece of catheter inside Steinkamp=s vein to travel
dangerously toward her heart.@  Id. at 197.

But Steinkamp is distinguishable. 
There, the court determined that the case did not involve the use of a
mechanical instrument; rather, it turned on the act of leaving a broken piece
of a mechanical instrument inside the patient=s body.  Id.
at 197.  The court concluded that the particular act of leaving the piece of
catheter in the patient=s vein, which required her to undergo
surgery without anesthesia, was not a situation in which expert testimony was
needed.  Id. at 196B97.  In this case, however, the evidence
shows that whether the catheter sheared off due to negligence, whether leaving
the piece of catheter in Mr. Losier=s disc, and the
causal connection, if any, between the presence of the catheter and Mr. Losier=s pain were
matters not within the common knowledge of lay persons.  








As discussed above, the experts presented
opposing opinions concerning how the catheter broke and whether Dr. Ravi was
negligent in performing the IDET procedure.  Additionally, whether it was
negligent to leave the sheared catheter in Mr. Losier=s body is not a
matter within the common knowledge of laymen.  Dr. Ravi testified that he did
not unintentionally leave the catheter piece in Mr. Losier=s disc, nor did he
leave it because he forgot to retrieve it or was inattentive or not paying
attention.  Dr. Ravi testified that when the catheter broke off, he checked the
fluoroscopy to determine that the piece was safely lodged within the disc.  He
testified that the standard of care in that situation was to leave the piece of
catheter in place.  Likewise, Dr. Dai testified that it was not below the
standard of care for Dr. Ravi to leave the broken catheter in Mr. Losier. 
Further, one of Mr. Losier=s treating physicians, noted in Mr. Losier=s chart that the
catheter in the L5-S1 disc was Anothing to be concerned about@ and Areally of no
consequence.@  He further opined that A[i]t certainly
does not warrant retrieval.@  Dr. Ackerman, the Losiers= expert, agreed
that he had no reason to think that the catheter piece in Mr. Losier=s disc was ever
going to move, and that it would probably stay exactly where it is. 

The experts also disagreed on whether the
retained catheter caused or contributed to Mr. Losier=s pain.  Mr.
Losier complained of pain, but Dr. Dai testified that there were other reasons
for his pain.  Dr. Dai testified that, although it was theoretically possible
that the catheter may cause pain, given Mr. Losier=s history, she
could not confirm with reasonable medical probability that the catheter was
causing him pain.  In contrast, Dr. Atkinson opined that the retained catheter
was contributing to Mr. Losier=s pain, although he did not think it was
the total cause of his pain. 

Based on the evidence presented,
therefore, we conclude that this case is more analogous to Traut than Steinkamp,
because whether Dr. Ravi negligently performed the IDET procedure and whether
the piece of catheter retained in Mr. Losier=s disc caused or
contributed to his pain are matters plainly not in the common knowledge of laypersons. 
See Traut, 667B68; see also Shelton v. Sargent,
144 S.W.3d 113, 120B21 (Tex. App.CFort Worth 2004, pet.
denied) (stating that the relevant inquiry is whether the proper performance of
the medical procedures is commonly known or within the common knowledge of a
layperson); Arguello v. Gutzman, 838 S.W.2d 583, 588 (Tex. App.CSan Antonio 1992,
no pet.) (rejecting applicability of res ipsa loquitur when jaw of
meniscus grabber broke off in patient=s knee during
surgery and holding that proper use of the device was not a matter plainly
within the common knowledge of laymen).

We therefore overrule the Losiers= first issue.

III








In their second issue, the Losiers contend
that the trial court erred in denying their motion for new trial based on juror
misconduct.  According to the Losiers, during a break in the trial their
counsel=s paralegal, Jana
Tevis, saw an extensive conversation among a juror, the defense counsel=s paralegal, and
the defendants= insurance representative.  The Losiers contend that
the contact was sufficient to demonstrate misconduct and that they are entitled
to a new trial.  We review the trial court=s denial of a
motion for new trial for abuse of discretion.  Dir., State Employees Workers= Comp. Div. v.
Evans, 889 S.W.2d 266, 268 (Tex. 1994); Stevens v. Anatolian Shepherd Dog
Club of Am., Inc., 231 S.W.3d 71, 77 (Tex. App.CHouston [14th
Dist.] 2007, pet. denied).

As a threshold matter, appellees contend
that the Losiers waived their complaint of juror misconduct because they failed
to complain before the verdict was read, citing Alamo Carriage Service, Inc.
v. City of San Antonio, 768 S.W.2d 937 (Tex. App.CSan Antonio 1989,
no writ).  In Alamo Carriage, the appellant claimed juror misconduct in
his motion for new trial.  Id. at 942B43.  Because the
appellant made no objection at the time of the incident or before the verdict,
the appellate court overruled the complaint, stating:

We
believe that it would be wantonly unfair to allow a litigant to take his
chances with the jury and later complain of misconduct when he is unhappy with
the result.  A party may not speculate on the result of a verdict and then for
the first time complain of jury misconduct.  

Id. at 943.  The Losiers respond that, unlike
the situation in Alamo Carriage, the jury misconduct was witnessed by a
non-lawyer employee of the Losiers= law firm the day
the jury returned its verdict, and there is no evidence the misconduct was
actually brought to counsel=s attention before the jury returned its
verdict.  The Losiers cite as support Mercado v. Warner-Lambert Co., 106
S.W.3d 393 (Tex. App.CHouston [1st Dist.] 2003, pet. denied)
(holding that appellant did not waive right to complain of jury misconduct not
witnessed by appellant=s counsel).








We conclude that the Losiers have not
waived this issue.  During the evidentiary hearing on the Losiers= motion for new
trial, Tevis testified that she saw the encounter with the juror on the day
before the jury returned its verdict, and at first she testified that she
advised the Losiers= counsel, Mark Sparks, about it before the
verdict was rendered.  On redirect, however, she testified that Sparks
approached the trial court about the alleged misconduct Aimmediately@ after she told
him about the encounter.  The trial court asked Tevis why she did not tell
Sparks earlier, and she responded that she was Acaught up in
trying to get [her] exhibits ready, trying to get back in the courtroom@ when it Adawned on [her]@ that the conversation=s length Awasn=t normal.@  The appellees
offered no contrary evidence. 

Thus, the evidence shows that Tevis
brought the encounter to Spark=s attention as soon as she realized, in
the push toward the trial=s conclusion, that the encounter may have
been improper.  Sparks then brought the encounter to the trial court=s attention Aimmediately@ thereafter.  In
this situation, and in the absence of contrary testimony, we conclude that the
Losiers did not waive the issue of juror misconduct.

We next turn to the merits of the Losiers= issue.  The
Losiers= complaint
regarding the alleged misconduct involving a juror is governed by Texas Rule of
Civil Procedure 327(a), which provides, in pertinent part, as follows:

When
the ground of a motion for new trial, supported by affidavit, is misconduct of
the jury ... or because of any communication made to the jury, ... the court
shall hear evidence thereof from the jury or others in open court, and may
grant a new trial if such misconduct proved, or the communication made, ... be
material, and if it reasonably appears from the evidence both on the hearing of
the motion and the trial of the case and from the record as a whole that injury
probably resulted to the complaining party.  








Tex. R. Civ. P. 327(a).  Jury misconduct includes
outside influence on jurors.  Strauss v. Continental Airlines, Inc., 67
S.W.3d 428, 446 (Tex. App.CHouston [14th Dist.] 2002, no pet.).  AOutside influence@ has been held to
mean information coming from outside the jury, i.e., from a non‑juror who
introduces information to affect the verdict, and not from within the jury's
deliberations or as part of the jury's mental process.  Id.[3]

To warrant a new trial for jury
misconduct, the Losiers had the burden to prove that (1) there was misconduct,
(2) it was material, and (3) probably caused injury.  See Golden Eagle
Archery, Inc. v. Jackson, 24 S.W.3d 362, 372 (Tex. 2000).  Whether
misconduct occurred is a question of fact for the trial court, and if there is
conflicting evidence on this issue the trial court=s finding must be
upheld on appeal.  Id.; Pharo v. Chambers County, 922 S.W.2d 945,
948 (Tex. 1996).  Misconduct justifies a new trial only if it reasonably appears
from the record that Ainjury probably resulted to the
complaining party.@  Pharo, 922 S.W.2d at 950.  To
show probable injury, there must be some indication in the record that the
alleged misconduct most likely caused a juror to vote differently than he would
otherwise have done on one or more issues vital to the judgment.  Id. 
Determining the existence of probable injury is a question of law.  Id. 


To support their assertion that the juror=s contact with the
defense paralegal and insurance representative is sufficient to warrant a new
trial, the Losiers cite to Texas Employers= Insurance
Association v. McCaslin, 159 Tex. 273, 317 S.W.2d 916, 921B22 (1958), in
which the supreme court held that the plaintiff=s overt act in
seeking out a juror and asking her to Ado all you can to
help me@ was sufficient to
demonstrate probable harm.  The McCaslin court noted that A[a] juror=s disavowal of
influence derived from misconduct is not a proper inquiry.@  Id. at
920.  Instead, the court explained, the presence or absence of injury Amust be drawn from
overt acts such as conversations and physical actions, i.e., what was said and
done.@  Id.   








The Losiers argue that the jurors
undoubtedly knew the paralegal, Monica Lee, worked for the defendants= attorneys because
she was introduced in voir dire, and therefore the juror, Robert Mulvey, was
aware of her relationship to the defendants.  Cf. Mercado, 106 S.W.3d at
397 (holding that there could be no conscious or subconscious influence from
shadow juror=s contact with juror when juror was unaware of shadow
juror=s affiliation with
a party).  The Losiers further contend that because the insurance
representative, John Southrey, had a pecuniary interest in the case, he and Lee
were not far-removed from the case, but rather were Apart and parcel@ of the defense
team.  Given these relationships, the Losiers argue, injury should be presumed
from the contact itself.

In her affidavit accompanying the Losiers= motion for new
trial, Tevis stated that she was a paralegal for Mark Sparks of the Losiers= law firm.  She
further stated that while on a break during the trial, she saw Monica, the
defendants= paralegal, and Dr. Ravi=s insurance
representative, AJohnny,@ outside the
courtroom Aeating their lunch while visiting with one of the
jurors.@  She went into a
conference room just inside the courtroom to organize her exhibits in
preparation for a meeting with Monica.  After more than ten minutes, she went
back out into the hallway and Aobserved Monica and Johnny still visiting
with this juror.@  Further, Tevis stated that the three of
them were Aactively engaged in conversation and laughing for at least
ten (10) minutes.@








In response, the defendants submitted the
affidavits of Monica Lee, John Southrey, and the juror, Robert Mulvey.  Lee
stated in her affidavit that she was a paralegal at the defense counsel=s firm, and that
she had reviewed Ms. Tevis=s affidavit and it was incorrect Awith regard to
what transpired.@  She stated that she and Southrey saw
Tevis come out of the courtroom to ask to go over exhibits.  Lee further stated
that she and Southrey were sitting in the hall outside the courtroom eating
lunch and talking only to each other.  Mr. Mulvey overheard Southrey and her
talking about Austin traffic, and he made several comments about it.  Lee
further stated that she told Mulvey that they could not talk until the trial
was over, and Mulvey walked away.  Finally, Lee stated that the exchange Adid not take more
than a few seconds and definitely did not take 10 minutes.@

Southrey identified himself in his
affidavit as a claim supervisor for Texas Medical Liability Trust.  He stated
that Tevis=s recitation of the events was incorrect.  He further
stated that he and Monica saw Tevis come out of the courtroom to tell Monica
something, and at that moment, he and Lee were sitting in the hall outside of
the courtroom eating lunch and were not talking with Mulvey.  Southrey stated
that Monica Ahad already admonished [Mulvey] that we could not talk
to him until the trial was over at which point he walked away from us.@  Southrey went on
to state that Mulvey had apparently overheard him and Monica Atalking about the
fact I live in Austin@ and Mulvey commented that Austin traffic
was Ahorrible.@  Southrey said
that he told Mulvey that he Aagreed with [Mulvey=s] observation,
but I intentionally tried not to even make eye contact with him at the time and
continued with my lunch.@  Finally, Southrey stated that AMonica told him we
could not talk until the trial was over, and Mr. Mulvey proceeded to walk away.@

Robert Mulvey, the juror, averred that
during the lunch break, he was outside the courtroom in the hall, looking out
the window.  He heard two people he did not know discussing Austin traffic.  He
commented to them that he traveled to Austin for business and that Austin
traffic was Apretty bad.@  Mulvey averred
that the female, whom he had since learned was Monica Lee of the defendants= law firm, Acommented that we
should not talk until after the trial.@  He further
stated that, although he had seen both of them in the courtroom, he also did
not know who the gentleman was or his reason for being there.  Mulvey stated
that AMs. Lee instructed
that there should be no conversation with jurors until after the trial was over@ and that A[t]here was no
further conversation with Ms. Lee or the gentleman.@








At the evidentiary hearing before the
trial court, only Tevis testified.  Her testimony repeated the substance of her
affidavit, except that she now knew that the juror=s name was Robert
Mulvey.  She stated that when she first saw Lee, Southrey, and Mulvey, Lee and
Southrey were sitting, finishing their meal, and Mulvey was standing.  They
were all facing each other and talking.  Tevis left to get her exhibits in
order, and when she returned five to ten minutes later, they were all Astill talking,
laughing, [and] having a conversation.@  She testified,
however, that she could not hear the substance of the conversation. 
Additionally, she testified that she saw them three different times talking and
laughing over a period of fifteen to twenty minutes.  On cross-examination,
Tevis admitted that, while she was in the courtroom, she could not see them or
hear any of their comments.  She also admitted that she did not know if Lee
told Mulvey they could not talk to him or how many times Lee told him that. 
She also could not say who initiated the comments or what was discussed.  In
response to further questioning, Tevis stated that, after the verdict was
rendered, she overheard Lee tell Mulvey Anow you can talk
to me.@

The trial court criticized Southrey=s and Lee=s conduct, saying
that they Ashould know better@ and that it was
not just the act of impropriety, it was the appearance of impropriety that
should have been avoided.  Nevertheless, the court found no evidence that Southrey,
Lee, and Mulvey were talking about the case, and concluded that the Losiers
failed to meet their burden under Rule 327(a).  The trial court made no
findings of fact or conclusions of law.








Because the trial court did not make
findings of fact or conclusions of law, we assume that all findings support the
judgment.  See Mercado, 106 S.W.3d at 396.  Although the parties dispute
the length of time Southrey, Lee, and the juror Mulvey conversed, Tevis offered
no evidence that they were discussing the case or that any favors were
requested or received such as occurred in McCaslin.  And, all three
agreed that Lee told Mulvey that she and Southey could not talk to him until
after the trial, and there was no evidence to the contrary.  Additionally,
Mulvey stated in his affidavit that at the time he made his comments to Lee and
Southrey, although he had seen them in the courtroom, he did not know who they
were.  This testimony undercuts the Losiers= argument that
harm may be presumed in part because Mulvey was aware of Lee=s relationship to
the defendants, and in fact supports the opposite conclusion.  See Mercado,
106 S.W.3d at 397.  On this record, we conclude that the evidence does not rise
to the level required to presume injury for purposes of Rule 327(a).  See id;
Strauss, 67 S.W.3d at 448.  Therefore, we hold that the trial court did
not abuse its discretion in denying the Losiers= motion for new
trial on the ground of juror misconduct or tampering.

We overrule the Losiers= second issue.

* * *

Having overruled the Losiers= two issues, we
affirm the trial court=s judgment.

 

 

 

 

/s/      Jeffrey
V. Brown

Justice

 

 

 

 

 

Panel consists of Justices Seymore, Brown and Sullivan.









[1]  During the pendency of this appeal, this court
received a suggestion of death informing us that Orville Losier had died and
that Joelle Losier requested that the appeal continue.  This court will proceed
to adjudicate the appeal.  See Tex. R. App. P. 7.7(a)(1).





[2]  Specifically, the Losiers point to Dr. Ravi=s testimony that he did not have exclusive control of
the needle and catheter because to some extent Athe disc directs where the catheter can go.@  The Losiers argue that this testimony was merely a
clever attempt to create a fact issue that is irrelevant to the application of res
ipsa loquitur.  Our resolution of this issue, however, obviates the need
for us to consider this testimony.





[3]  Although the Losiers also refer, in a cursory
fashion, to the right to a fair and impartial trial as guaranteed by the
article I, section 15, of the Texas Constitution and the right to due process
afforded by the Texas and United States Constitutions, they fail to present any
argument, citations to the record, or citations to relevant authorities to
support these references.  Therefore, we do not consider them.  See Tex.
R. Civ. P. 38.1(i).